UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ZIMMER NEXGEN KNEE | ) | |
| IMPLANT PRODUCTS LIABILITY | ) | MDL NO. 2272 |
| LITIGATION | ) | |
| | ) | |
| This Document Relates to All Cases | ) | Master Docket Case No. 1:11-cv-05468 |
| | ) | |
| | ) | Honorable Rebecca Pallmeyer |

## THE ZIMMER ENTITIES'[1] MEMORANDUM IN
## RESPONSE TO PLAINTIFFS' PROPOSED PROTECTIVE ORDER

The parties have agreed on some but not all of the terms of a protective order. The primary remaining dispute is how correctly to limit cross-product discovery in these lawsuits. On August 8, 2011, the Judicial Panel on Multidistrict Litigation ("JPML") granted the plaintiffs' motion to create this multidistrict litigation ("MDL"), citing the principle that "centralization under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." (Transfer Order, Doc. 1, p. 2.) To accommodate the demonstrated differences among the products at issue, the JPML advised the Court that it could "formulate a pre-trial program that…allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues." (*Id.*) With this language, the JPML recognized that even though substantial common discovery might exist in the lawsuits, this does not mean that all of the discovery relevant to one consolidated lawsuit will be relevant to every other lawsuit.

---

[1]  Zimmer, Inc., Zimmer Holdings, Inc., Zimmer Orthopaedic Surgical Products, Inc., Wilson/Phillips Holdings, Inc., d/b/a Zimmer Wilson/Phillips, Orthopaedic Technologies, LLC, d/b/a Zimmer Tri-State (incorrectly named as (1) Zimmer Tri-State, d/b/a Tri-State Orthopaedic, (2) Zimmer Tri-State, d/b/a Zimmer, Inc., and/or (3) Zimmer Tri-State, d/b/a Tri-State Orthopedic), and K. Michael Melia, d/b/a Zimmer Melia & Associates, Inc. (incorrectly named as Zimmer Melia & Associates, Inc.), Zimmer Orthobiologics, Inc., Zimmer Surgical, Inc., and Zimmer US, Inc.

The Zimmer Entities submit that now is too early to make a blanket decision about what cross-product discovery is and is not relevant to each product. The protective order should preserve the issue, and allow the Court to decide specifics if they arise and cannot be resolved.

While the Zimmer Entities have documents that relate to all of the seven or more products at issue in these lawsuits, they also have many product-specific documents that relate to only one product or some of the products. Many of these "product-specific" documents will contain the Zimmer Entities' trade secrets and confidential information. The Zimmer Entities ask the Court to decline the plaintiffs' invitation to view their MDL proceeding as a wedge to deprive the Zimmer Entities of their rights to protect their proprietary product information from disclosure to a broad group of persons who would never get such access in an individual case. The Zimmer Entities' version of the Proposed Protective Order (submitted jointly herewith) simply asks the Court to limit the disclosure of confidential, product-specific documents to those lawsuits involving the referenced products.

By contrast, the plaintiffs ask the Court to allow every single confidential document produced by the Zimmer Entities, on any of the seven or more products combined into this action, to be viewed by any of the hundreds of lawyers, staff, consultants and experts connected to a lawsuit in this MDL. This proposal that would lead to the early and widespread disclosure of the Zimmer Entities' trade secrets in lawsuits to which they have no relevance.[2] Coordinated document discovery in an MDL should be used to create efficiency, not to circumvent the standard of relevancy prescribed by the Federal Rule of Civil Procedure or the typical protections afforded to trade secrets. *See* Fed. R. Civ. P. 26(b)(1) & 26(c)(1)(G). If a plaintiff and his or her

---

[2] Plaintiffs' lack of regard for the confidentiality of the Zimmer Entities' trade secrets is no surprise, given their prior advocacy for "the prompt production of Defendants' documents without **any** confidential designation," and they contend that "confidential designation should **rarely** be afforded designation on documents." (Pl.'s Req. for Prot. Order, Doc. 43, p. 1; emphasis supplied.)

attorney would not have received certain confidential documents in their individual lawsuit, they should not receive them simply because the lawsuits have been consolidated into an MDL.

And, any prejudice to the plaintiffs would be eliminated by the complete access to all produced documents afforded Plaintiffs' Lead Counsel.

The parties also disagree about a number of other issues, including: (1) the sharing of the Zimmer Entities' confidential information with the plaintiffs' attorneys outside this MDL and fact witnesses; and (2) the redaction of irrelevant information from otherwise relevant documents.

I.      **The Court Should Deny Plaintiffs' Request For Unlimited Cross-Product Discovery**

      A.      **Unnecessary Sharing Of The Zimmer Entities' Confidential Information Increases The Likelihood That It Will Fall Into The Hands Of Their Competitors**

Rule 26(c) of the Federal Rules of Civil Procedure provides that "[t]he court may, for good cause, issue an order…requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way…." Fed. R. Civ. P. 26(c)(1)(G). Importantly, the Zimmer Entities do not ask the Court to hold that certain documents should not be revealed at all. Lead Counsel will get all documents. And, if a confidential document has relevance to more than one product under the standard provided by Rule 26(b)(1), then the Zimmer Entities will mark it accordingly. However, the Zimmer Entities do ask the Court to limit the disclosure of their confidential and product-specific information to those lawsuits to which the information has demonstrable relevance.

More specifically, the Court should not permit Plaintiffs' Lead Counsel to share confidential documents that are specific to only one product (or that may relate to more than one but fewer than all products) with attorneys whose lawsuits do not involve the relevant product or products. As this Court has previously observed, the liberal sharing of a company's trade secrets

among plaintiffs' attorneys needlessly increases the likelihood that those secrets will fall into the hands of the company's competitors. *See Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 306-307 (N.D. Ill. 1993), *clarified on other grounds by Culinary Foods, Inc. v. Raychem Corp.*, 153 F.R.D. 614 (N.D. Ill. 1993) ( "if [plaintiff] were allowed to disseminate the confidential information, this would unduly raise the risk that [defendant's] competitors will obtain access to this confidential information"). That likelihood increases geometrically with the number of lawyers having access: here, there are already 20 law firms in the Joint Prosecution Group seeking access to this information.

In a competitive industry, the Zimmer Entities have cultivated trade secrets and other confidential information from their investment in research and testing and from the ingenuity of their engineers. The Zimmer Entities deserve the benefit of that confidential information, and the Court should not force it to be disclosed to plaintiffs' attorneys who have no legitimate need for it.[3]

**B.** **The Plaintiffs Cannot Obtain Discovery Regarding Products That Do Not Share The Same Relevant Design Characteristics**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense …. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). However, "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery." *Piacenti v. General Motors Corp.*, 173 F.R.D. 221, 224 (N.D. Ill. 1997) (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)).

---

[3] Technology has made the sharing of documents exceedingly easy; thousands of pages of documents can be electronically accessed or transferred in a moment's time. Furthermore, should the Zimmer Entities' confidential information be accessed by their competitors, they will likely not learn of that access for years, if ever. By then, it will be impossible for the Zimmer Entities or this Court to determine how the disclosure occurred and what parties were responsible. The harm will not be reparable.

The core question here is whether, under Rule 26(b)(1), Zimmer's documents specific to only one or a few of the products at issue are discovery-relevant in all of the lawsuits. Courts have developed a simple test for deciding whether cross-product discovery is appropriate in products liability cases. Before allowing cross-product discovery, the Court must decide whether the design characteristic at issue is meaningfully similar in all of the products. *See Piacenti*, 173 F.R.D. at 225-226; *Hofer*, 981 F.2d at 380-81. "[O]nly where the similar models have the same component parts or defects should discovery be allowed." *Piacenti*, 173 F.R.D. at 225. As discussed more fully below, many of the pertinent design characteristics here differ from product to product. On this standard, the Court should not allow unlimited cross-product discovery.

### C. The Basics Of Total Knee Replacement Surgery And The Zimmer Entities' *NexGen*® Knee Replacement Products

In total knee replacement surgery (total knee arthroscopy or "TKA"), a surgeon removes parts of the bones in the knee and resurfaces the internal knee surfaces with plastic and metal implants. The implants help restore joint mobility and relieve pain. Every total knee prosthesis includes a tibial component (or "tibial tray"), a femoral component, and a weight-bearing plastic insert between the two ("tibial insert" or "articulating surface"). The tibial component attaches to the top of the lower leg bone (tibia). The femoral component attaches to the bottom of the upper leg bone (femur). The articulating surface, made of high-grade polyethylene, snaps into the tibial component and provides the surface on which the femoral component rotates or articulates. In addition, each implant includes a replacement kneecap (patella). *See* illustration below.

BDDB01 6874373v5



Currently, this MDL involves one *NexGen*® tibial component and at least six *NexGen*®

flex femoral components.  The lone tibial component, the *NexGen*® MIS Total Knee Procedure

Stemmed Tibial Component Fixed Bearing Precoat (the "MIS Tibial Component" or "5950"), is

an outlier in this MDL.  Tibial components occupy a different location and perform a

fundamentally distinct function in the body, and therefore have starkly different designs, from

femoral components.

The six[4] *NexGen*® flex femoral components now at issue in these lawsuits include:

(1) the CR-Flex Porous; (2) the CR-Flex Precoat; (3) the LPS-Flex Precoat; (4) the LPS-Flex

Option; (5) the Gender Solutions CR-Flex; and (6) the Gender Solutions LPS-Flex.  Though

these components do have some similarity, certain design characteristics distinguish them.  First,

each product's design requires either the retention of the posterior cruciate ligament (the "CR" or

"cruciate-retaining" femoral components) or removal of the patient's posterior cruciate ligament

("LPS" or "*Legacy* Knee Posterior Stabilized" femoral components).  Second, each product's

bone-facing surface is precoated for fixation with cement ("Precoat" femoral components), or is

---

[4]  One of the centralized cases, *Langevin v. Zimmer, Inc., et al.,* involves a seventh femoral component:
the LPS femoral component.  However, because this component is not a flex femoral component, the
Zimmer Entities plan to request that it be remanded to its original court.  Furthermore, once the Zimmer
Entities begin to obtain exact product identification information for the products in the lawsuits, it is
likely that the parties will discover that more *NexGen*® flex femoral components are actually at issue.

porous and uncoated for use without cement ("Porous" femoral components). Third, some components are specifically designed for the treatment of women and their unique knee anatomy (the "Gender Solutions" products). Finally, and most importantly to the Court's inquiry here, depending on whether a femoral component is a CR-Flex cruciate-retaining product or a LPS-Flex posterior-stabilized product, the products have different design characteristics to help safely accommodate high-flexion activities for those patients with the desire and ability to perform them.

> **D.      The Zimmer Entities' Products At Issue In The Lawsuits Do Not Share Enough Relevant Design Characteristics To Allow Cross-Product Discovery**

The first step in evaluating potential cross-product discovery is to identify the product design characteristics relevant to the plaintiffs' alleged defect. The second step is to compare the products at issue to assess whether these relevant characteristics overlap across products. If the relevant design characteristics differ among the products, then the Court should not permit cross-product discovery. *See Piacenti*, 173 F.R.D. at 224-26.

> **1.      Confidential Documents Related Solely To The MIS Stemmed Tibial Component Should Not Be Produced In Lawsuits That Do Not Involve That Product**

Tibial components and femoral components share little in common. As discussed above, the *NexGen*® MIS Tibial Component has a starkly different function and a starkly different design from the *NexGen*® flex femoral components. They do not share design characteristics relevant to the plaintiffs' theory of defect. *See Piacenti*, 173 F.R.D. at 225-26. Here, the MIS Tibial Component shares no common design characteristics with the *NexGen*® flex femoral components. Indeed, it is used with both flex and non-flex femoral components.

To date, the plaintiffs have not argued to the contrary. Instead, in seeking an MDL before the JPML, the plaintiffs argued that the *NexGen*® MIS Tibial Component suffers from a separate defect, arguing that "[i]n those cases [involving an MIS Tibial Component], there is an

BDDB01 6874373v5

*additional* claim of defect in the tibial component." (Repl. Supp. Mot. for Centralization, Case MDL No. 2272, Doc. 58, p. 1) (emphasis in original.) However, "[o]nly where the similar models have the same component parts or defects should discovery be allowed." *Piacenti*, 173 F.R.D. at 225. Therefore, confidential documents pertaining to the MIS Tibial Component should not be produced in lawsuits that do not implicate that component as the alleged cause of plaintiff's injuries.

>2.    **Confidential Documents Pertaining To The Zimmer Entities' Cruciate-Retaining Flex Femoral Components Should Not Be Produced In Lawsuits Involving Posterior-Stabilized (LPS) Flex Femoral Components, And Vice Versa**

The plaintiffs have argued that all *NexGen*® flex femoral components suffer from a common defect. The plaintiffs told the JPML that the "common underlying theory in all these cases is that the *engineering changes intended to provide additional flexion* is causing premature failure more often than in the standard flex implants and provides no additional benefit to the patient." (Repl. Supp. Mot. for Centralization, Case MDL No. 2272, Doc. 58, p. 2) (emphasis added). Though that theory of defect is both vague and incorrect, the plaintiffs did make clear that the design characteristics at issue here are the "engineering changes" made to the Zimmer Entities' non-flex *NexGen*® femoral components to allow patients to perform high-flexion activities more safely. Hence, in determining the appropriateness of cross-product discovery, the Court must ask if the "engineering changes" related to flexion are the same in all of the flex femoral components at issue in this MDL. *Piacenti*, 173 F.R.D. at 225-26.

They are not.

Attached as Exhibit A to this memorandum is a document titled "Zimmer® NexGen® Flex Knee Design Rationale" (the "Design Rationale"). The Design Rationale outlines not only

the objective behind the flex femoral components,[5] but also the specific design changes used to accomplish that objective.

Those changes were not the same for all of the flex femoral components. The "engineering changes" applied to the Zimmer Entities' *NexGen*® cruciate-retaining femoral components differ significantly from those applied to the *NexGen*® cruciate-sacrificing LPS-Flex components. Though the language and descriptions of these changes are technical, the figures and more complete descriptions contained in the Design Rationale help illustrate their purpose:

**Feature One – Minus Sizes** – The CR-Flex has "**Minus Sizes** that are 2mm smaller in the external A/P dimension to provide an additional means of adjusting the flexion gap without affecting the extension gap." (Design Rationale, p. 7.)

**Feature Two – Enhanced Lateral Condyle** – This feature aids "symmetrical femoral rollback." (Design Rationale, p. 7.) "On the CR-Flex Fixed Bearing Knee the radius of the lateral condyle has been extended posteriorly to enhance the 'Big Wheel/Little Wheel' asymmetric design." (Design Rationale, p. 14.) For an illustration of this change and its impact, please see Figures 11-13 on p. 14 of the Design Rationale.

**Feature Three – Wider Intercondylar Opening** – This feature "promote[s] internal/external rotation during high flexion and provide[s] more space for the PCL." (Design Rationale, p. 7.) Obviously, because the PCL is removed when implanting an LPS-Flex, this design feature was not implemented in that femoral component.

**Feature Four – Lowered Height of Lateral Condyle** – This feature "reduce[s] the tightness of the retinacular ligament during high flexion." (Design Rationale, p. 7.) According to the Design Rationale, "[t]his reduction in height was intended to mimic the normal anatomic drop in the lateral tibial plateau and the shape of the posterior femoral condyle." (Design Rationale, p. 14.)

**Feature Five – Narrower M/L [Mediolateral] Width** – This feature allows the surgeon greater flexibility to adjust the mediolateral position of the femoral component. (Design Rationale, p. 7.)

Conversely, the LPS-Flex has some unique engineering features not seen in the CR-Flex.

Specifically, the LPS-Flex features "*[i]ncreased (or enhanced) resistance to anterior*

---

[5] Contrary to the plaintiffs' mistaken assertions, the products are not designed to "create" higher flexion, but merely to "safely accommodate high flexion" in patients who can otherwise achieve it. (*See* Design Rationale, p. 7.)

*subluxation.*" (Design Rationale, p. 7) (emphasis omitted). To achieve this benefit, "the shape of the cam on the LPS-Flex Femoral Component has been modified to contact the spine more inferiorly and thereby provide a greater jump height at flexion angles greater than 130˚." (Design Rationale, p. 16.) This change also reduces the "bending moment" applied to the spine of the tibial articular surfaces used with the LPS-Flex femoral components. (Design Rationale, p. 16.)

There is at least one common design change made in both the CR-Flex and LPS-Flex femoral components: an extension of the weight-bearing posterior femoral condyles, which prevents the femoral component from "digging in" to the polyethylene of the tibial articulating surface. (*See* Design Rationale, pp. 7-8.) However, this change reduces the amount of wear on an entirely different component, the tibial articulating surface or plastic pad between the tibial and femoral components. The plaintiffs have not made that pad part of this case.[6]

According to the plaintiffs, the relevant design features in the lawsuits involving the *NexGen*® flex femoral components are the "engineering changes" used to make the femoral components safer for high-flexion activities. As outlined above, many of the relevant engineering changes differ from one femoral component to another. With respect to the design characteristics actually relevant to the lawsuits in the MDL, the CR-Flex is not similar enough to the LPS-Flex to permit blanket cross-product discovery. *Piacenti*, 173 F.R.D. at 224-26. Therefore, confidential documents related solely to the various CR-Flex femoral components (including the porous, precoat, and Gender Solutions versions of the products) should not be disclosed in lawsuits involving one of the LPS-Flex femoral components, and vice versa.

---

[6] The Design Rationale also notes that certain *NexGen*® tibial articular surfaces were altered to "reduce patellar tendon tension and provide relief for the inferior patellar bone." (Design Rationale, p. 7.) However, at no point have the plaintiffs claimed a defect in the tibial articular surface, instead focusing only on the alleged premature "loosening" of the *NexGen*® flex femoral components.

3.    **Because The Other Product Differences Among The Flex Femoral Components Will Affect The Application Of Plaintiffs' Common Theory Of Defect, The Court Should Prohibit All Cross-Product Discovery**

Finally, the plaintiffs' request for cross-product discovery oversimplifies the science that the parties will apply in these lawsuits. Medical device products liability cases focus on the kinematics and forces applied to the products *in vivo*. Though the plaintiffs have not yet clearly articulated why they believe the engineering changes related to flexion constitute a defect, they will likely claim that these changes somehow create forces that lead to premature loosening of the femoral component. The Zimmer Entities have already outlined the key distinctions related to whether a flex femoral component is cruciate-retaining ("CR") or posterior-stabilized ("LPS"). However, other distinguishing design features, such as whether a product uses cement (precoat) or is uncemented (porous), or whether the design includes gender-specific geometry, also meaningfully affect the forces applied to the products *in vivo*.

For an illustration of the significance of these core design distinctions, the Court need only look to the experiences and actions of the plaintiffs' purported star witnesses, Dr. Richard Berger and his colleague, Dr. Craig Della Valle. Arguing that all *NexGen*® flex femoral components are defective, the plaintiffs have relied heavily upon Dr. Berger's presentation at the 2010 Annual Meeting of the American Academy of Orthopaedic Surgeons. (*See* Br. Supp. Mot. for Cent., MDL No. 2272, Doc. 1-1, pp. 1, 2, 15; Reply Supp. Mot. for Cent., MDL No. 2272, Doc. 58 p. 6 & n.7.) That presentation, however, reported Dr. Berger's and Dr. Della Valle's personal experience with just one of the *NexGen*® flex femoral components, the CR-Flex Porous component, in 108 of their patients. Yet, despite their stated reservations about the CR-Flex Porous component, Dr. Berger and Dr. Della Valle have not stopped implanting all the Zimmer Entities' *NexGen*® flex femoral components. To the contrary, Dr. Berger and Dr. Della Valle

11

combined to implant a total of 369 flex femoral components in the first half of 2011 alone. (Dec. of Paul Daniel, attached as Exhibit B.)

The conduct of Dr. Berger and Dr. Della Valle show that the application of the plaintiffs' theory of defect will vary depending on the product at issue. Accordingly, confidential documents and data related to one flex femoral component are not necessarily reliably applicable or relevant in lawsuits involving a different femoral component.

### 4. Plaintiffs' Reliance On The Zimmer Entities' 510(k) Applications Is Misplaced

In their briefing before the JPML, the plaintiffs cited language from the Zimmer Entities' 510(k) applications to create the appearance that all of the flex femoral components are the same. Plaintiffs will likely rely in this Court upon the same applications in arguing for the appropriateness of cross-product discovery. Plaintiffs' reliance is misplaced.

When a device manufacturer seeks regulatory clearance through the 510(k) process, the FDA requires the manufacturer to identify predicate devices that have been cleared as "substantially equivalent" in (1) basic technological characteristics embodied in the design of the product and predicate, (2) aspects of the product and predicate's labeling, and (3) performance data of the product and predicate. 21 C.F.R. § 807.100(b). The technological characteristics of virtually all artificial knees parallel those of a variety of predicate devices because, among other things, the basic science behind artificial knees dates back at least three decades and the FDA has cleared hundreds of knee replacement components for marketing during that time. Accordingly, multiple predicate devices often will be included in a 510(k) application. Individual features of the new device can be compared to the same or similar features as they appear in the different predicates, but no one predicate device exhibits all of the characteristics of the new or modified device. If it did, no additional clearance would be necessary.

As noted above, the similarity requirements for cross-product discovery have a much narrower focus, evaluating only the similarities or dissimilarities of the characteristics relevant to the claims and defenses in the action. *See Piacenti*, 173 F.R.D. at 224-26. This narrower focus dooms the plaintiffs' reliance on the Zimmer Entities' 510(k) applications. For example, in their briefing before the JPML, the plaintiffs cited the Zimmer Entities' 510(k) application for the CR-Flex. (Repl. Supp. Mot. for Cent., MDL No. 2272, Doc. 58, p. 3). In that application, the Zimmer Entities referenced two "predicate devices" for the CR-Flex: their non-flex CR femoral component and the LPS-Flex femoral component. (*Id.*) Plaintiffs quoted language from the application stating that "*except for modifications to allow flexion to 155 degrees*, CR-Flex femoral components are *identical* to the predicate device." (*Id.*) (emphasis added). But here, the "modifications to allow flexion to 155 degrees" are precisely the design characteristics that matter to the Court's cross-product discovery analysis. This example illustrates the need to parse through the 510(k) applications carefully to determine what they do and do not show.

### E.     Defendants' Proposed Protective Order Would Allow Common Discovery To Occur Simultaneously With Non-Common Discovery

The JPML advised this Court that it may "formulate a pre-trial program that…allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues." (Transfer Order, Doc. 1, p. 2.) Zimmer's Proposed Protective Order helps accomplish that goal. Confidential documents related to all CR-Flex femoral components and all LPS-Flex femoral components, such as the Design Rationale, can be affixed with a general "CONFIDENTIAL" designation. (*See* Exh. A, ¶ 1.a.)[7] Meanwhile, documents related to only one or a few of the products at issue in the MDL can be affixed with an additional tag, such as "CR-Flex Porous Component Only." (*See* Exh. C, ¶ 2.) These tags will allow the separation of common discovery from confidential documents relevant in only certain cases.

---

[7] A clean version of the Zimmer Entities' proposed Protective Order is attached hereto at Exhibit C.

For the reasons stated above, the products at issue differ significantly with respect to the design characteristics that matter. Thus, the Court should grant the Zimmer Entities' request for a ban on unlimited cross-product discovery. *See Piacenti*, 173 F.R.D. at 225-26.

## II. Plaintiffs Should Not Share The Zimmer Entities' Confidential Documents With Plaintiffs' Attorneys Outside This MDL Or Certain Fact Witnesses

In addition to arguing that the Court should place no limits on the sharing of the Zimmer Entities confidential information amongst the plaintiffs' attorneys participating in this MDL, the plaintiffs also seek permission to share the Zimmer Entities' confidential documents with any plaintiff's attorney with a similar case that is not part of this MDL. (*See* Exh. C, ¶ 2.) Courts have consistently rejected such broad sharing provisions in the individual case context, finding they "unduly raise the risk" that a defendant's competitors will obtain access to confidential information and make enforcement of a protective order "overly burdensome" to a defendant. *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 307 (N.D. Ill. 1993), *clarified on other grounds by, Culinary Foods, Inc. v. Raychem Corp.*, 153 F.R.D. 614 (N.D. Ill. 1993); *Gil v. Ford Motor Co.*, 2007 WL 2580792, at *5-6 (N.D. W.Va. Sept. 4, 2007) (rejecting sharing provision that would "enable other litigants, not involved in this case, to obtain the information without taking further action"); *Petersen v. DaimlerChrysler Corp.*, 2007 WL 914738, at *1 (D. Utah Mar. 5, 2007) (finding that "sharing requests can and should be considered on an 'as needed' basis…rather than 'opening the barn doors' with a broad order at this stage, which is anything but 'protective.'").

Additionally, the plaintiffs seek permission to share the Zimmer Entities' confidential documents with fact witnesses (such as treating surgeons) who have no prior knowledge of the content of those documents. (*See* Exh. C, ¶ 8.) Such a practice would result in the release of the Zimmer Entities' trade secrets to potentially hundreds of additional individuals. The Zimmer Entities' request that their confidential documents only be disclosed to those witnesses who have

prior knowledge of the specific content of those documents and any expert witnesses whose opinions rely upon the confidential documents.

### III. Consistent With Case Law In This Jurisdiction, The Court Should Allow Redaction Of Irrelevant, Sensitive Information

Plaintiffs ask the Court to order that "[c]onfidential documents…shall be produced in their entirety with no internal redaction with the exception of information that is covered by the attorney client privilege or work product doctrine." (Exh. C, ¶ 11.) The Zimmer Entities disagree. Courts within the Seventh Circuit recognize the use of Rule 26(c) to permit redaction of other irrelevant, sensitive information from documents. *See CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (noting use of order under Rule 26(c) to allow redaction of "unnecessary information"); *Beauchem v. Rockford Prods. Corp.*, 2002 WL 1870050, at *2 (N.D. Ill. Aug. 13, 2002); *Abbott v. Lockheed Martin Corp.*, 2009 WL 511866, at *2-3 (S.D. Ill. Feb. 27, 2009) (finding redaction appropriate where information was "not relevant to the issues in this case.") The Court should deny the plaintiffs' request for a ban on internal redactions of sensitive, irrelevant information.

<u>**CONCLUSION**</u>

The Zimmer Entities respectfully requests that the Court enter the Zimmer Entities' Proposed Protective Order as attached hereto at Exhibit C, thereby ensuring appropriate protection of the Zimmer Entities' trade secrets and confidential information pending resolution of what data is and is not relevant across products.

Dated:  September 30, 2011          Respectfully submitted,

BAKER & DANIELS LLP


/s/ Joseph H. Yeager, Jr.

Joseph H. Yeager, Jr. (Ind. State Bar #2083-49)
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
Telephone:     (317) 237-0300
Fax:         (317) 237-1000
Email:       jay.yeager@bakerd.com

Attorneys for Zimmer, Inc., Zimmer Holdings, Inc.,
Zimmer Orthopaedic Surgical Products, Inc., Wilson/
Phillips Holdings, Inc., d/b/a Zimmer Wilson/Phillips,
Orthopaedic Technologies, LLC, d/b/a Zimmer Tri-State
(incorrectly named as (1) Zimmer Tri-State d/b/a Tri-
State Orthopaedic, (2) Zimmer Tri-State d/b/a Zimmer,
Inc., and/or (3) Zimmer Tri-State d/b/a Tri-State
Orthopedic), K. Michael Melia, d/b/a Zimmer Melia &
Associates, Inc. (incorrectly named as Zimmer Melia &
Associates, Inc.), Zimmer Orthobiologics, Inc., Zimmer
Surgical, Inc., and Zimmer US, Inc.

16

<u>CERTIFICATE OF SERVICE</u>

I certify that on September 30, 2011, a copy of the foregoing The Zimmer Entities' Memorandum In Response To Plaintiffs' Proposed Protective Order was filed electronically.  Parties may access this filing through the Court's system.  I further certify that on September 30, 2011, a copy of the foregoing The Zimmer Entities' Memorandum In Response To Plaintiffs' Proposed Protective Order was sent by first-class United States mail, postage prepaid, upon the following:

Bharatio O. Sharma
Pogust Braslow & Millrood LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428

John P. Lavelle , Jr.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

Kevin R. Weiss
Laureate Group
1805 Kensington Drive
Waukesha, WI 53188

Kim M Schmid
Bowman & Brooke Law Firm
150 South Fifth Street, Suite 2600
Minneapolis, MN 55402

Mark E. Gebauer
Ecker Seamans Cherin & Mellott, LLC
213 Market Street, 8th Floor
Harrisburg, PA 17101

Melissa Fry Hague
1710 Spruce Street
Philadelphia, PA 19103

Roxanne Conlin
Conlin & Associates PC
319 7th Street, Suite 600
Des Moines, IA 50309

Richard J. Sapp
Nyemaster, Goode & McLaughlin
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Thomas R. Anapol
Anapol, Schwartz, Weiss & Schwartz
1900 Delancey Place
Philadelphia, PA 19103

William L. Bross, IV
Heninger Garrison Davis, LLC
2224 1st Avenue North
Birmingham, AL 35203

James T. Capretz
Capretz & Associates
5000 Birch Street, Suite 2500
Newport Beach, CA 92660

Don K. Ledgard
Capretz & Associates
5000 Birch Street, Suite 2500
Newport Beach, CA 92660

/s/ Joseph H. Yeager, Jr.

BDDB01 6874373v5