**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: ZIMMER NEXGEN KNEE** | ) | |
| **IMPLANT PRODUCTS LIABILITY** | ) | **MDL NO. 2272** |
| **LITIGATION** | ) | |
| | ) | **Master Docket Case No.: 1:11-cv-05468** |
| | ) | **ALL CASES** |
| This Document Relates to All Cases | ) | |
| | ) | **JUDGE REBECCA PALMEYER** |

**PLAINTIFF STEERING COMMITTEE'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR AN ORDER RESOLVING PLAINTIFF FACT
SHEET DISPUTES &/OR PLAINTIFF STEERING COMMITTEE'S
<u>REQUEST FOR A PROTECTIVE ORDER</u>**

Plaintiffs, by and through their undersigned counsel (collective referred to as "Plaintiffs Steering Committee" or "PSC"), hereby file their position statement regarding the Plaintiff Fact Sheet, and respectfully request the entry of an Order Resolving Plaintiff Fact Sheet Disputes. More specifically, and as set forth in greater detail below, the PSC respectfully requests that any Court-approved Plaintiff Fact Sheet ("PFS") in the above-referenced litigation:

- (1) Removes the question relating to Plaintiff's calculations of the total amount of time and wages/money that Plaintiff believes he or she lost as a result of her alleged knee replacement injury (set forth in Section I *infra*);

- (2) Removes the question concerning the total amount that Plaintiff's insurer paid and/or incurred in any medical expenses related to Plaintiff's knee replacement injury (set forth in Section II *infra*);

- (3) Removes the question concerning the specific loss of care, services, companionship, counsel, advice, assistance, comfort, consortium, or any similar loss which the loss of consortium Plaintiffs may claim (set forth in Section III *infra*); and

- (4) Removes from the document request section of the draft PFS a request for federal tax returns (set forth in Section IV *infra*);

In addition, the PSC also submits that the form Case Management Order ("CMO") that Defendants have proposed be modified as set forth herein insomuch as the only disputes concern *de minimus* timing deadlines. The respectfully submits that the differences – because so *de minimus* and so non-prejudicial – should be decided in favor of plaintiffs. (*See* Section V *infra*).

## **INTRODUCTION**

We agree with the Zimmer Defendants' introduction in their Brief is Support of Defendants' Motion to Approve Plaintiff Fact Sheet and Case Management Order No. 2, dated December 6, 2011 [Dckt 175], that "the parties have worked collaboratively to negotiate", and also that "the parties were successful in their negotiations."

The process has included countless telephone calls and emails, and has interrupted other scheduled events counsel have both had, as well as each side's personal lives, in order to come to agreement on over 94% of the PFS.

Indeed, through likely no fault of theirs, and because the parties were literally working until the last possible moment to come to agreement on the PFS, there are still certain issues in the proposed PFS submitted by Zimmer that the PSC had *not a*greed to accept and therefore which remain in dispute.[1]

As set forth in more detail below, the reason we must address these concerns now is because the PFS, when approved, will become a standard form that all plaintiffs/claimants must answer without objection. More simply put, it replaces interrogatories and document demands by way of a standardized form.

---

[1]  There also remain a few minor typographical and stylistic edits, particularly given all of the last minute editing. *See e.g.*, Section III. Q.6, which inadvertently references Q.3, but should reference Q.5.

The purpose of a PFS is to promote and encourage efficiency in discovery by and between similar cases either pending in a MDL or some other consolidated litigation. By having each Plaintiff involved in the litigation be required to produce and/or provide responses to similar questions and document demands, efficiency increases.[2]

Indeed, PFSs often inure greatly to the benefit of Defendants for several reasons. First, Defense counsel is typically able to negotiate potentially objectionable questions and/or issues with Plaintiffs' counsel once, rather than repeatedly with different Plaintiffs' counsel on non-uniform interrogatories. In such a circumstance, each and every Plaintiff's counsel may raise distinct objections to separate interrogatories based on a variety of different state laws, which would largely compromise the efficiency of the MDL process. To this end, the PFS generally replaces any interrogatories which would otherwise be served pursuant FED. R. CIV. P. 33.

Moreover, unlike FED. R. CIV. P. 33, the Defendants also benefit from a PFS by virtue of the number of questions that may be asked of a Plaintiff. While FED. R. CIV. P. 33 only permits 25 interrogatories (although leave is almost virtually always given and a

---

[2] Indeed, historically, implementation of uniform discovery devices began in the 1980s. As an example, one of the first uniform discovery devices in a mass tort was the Uniform Preliminary Response for Information ("UPRI"), which was first used in the context of the Diethylstilbestrol ("DES") litigation. The UPRI transformed into the modern-day PFS. All of which remain designed to be fact-garnered discovery instruments that are used in lieu of other discovery demands so that a standardized form is created and utilized. Thereafter and following implementation of the above process, the parties, with the Court's guidance, will develop a process by which a sub-set of cases can be worked up for trials, mediations or some other evaluation process (or combination of all three). This sub-set of cases is traditionally referred to as "bellwether plaintiffs" or "core discovery cases". It is this group of cases where Plaintiff depositions, treating doctor depositions and Defendant sales representative depositions are traditionally taken. This process usually also allows for additional limited discovery. Thereafter, this sub-set of cases is then usually narrowed down further to an even smaller sub-set of cases, which would include those cases that are actually prepared for trial and which have expert reports, completed expert discovery, and the other trial-ready work ups (*e.g.*, summary judgment, exhibit list, motions in limine, deposition designations, etc...). Of course, before deciding on any trial cases, the issues of Lexecon must be fully vetted and determined.

request for additional interrogatories rarely opposed), the draft PFS for this litigation currently consists of well over 25 questions, many of which have multiple subparts. As such, the PFS allows for a significant amount of additional discovery than traditional interrogatories would allow for under the Rules. However, similar to interrogatory responses, Defendants benefit from responses that are provided under oath and verified by each Plaintiff. Yet vastly different from interrogatories responses and document responses under the Federal Rules, various objections are not provided by all of the different Plaintiffs' counsel representing the hundreds of Plaintiffs across the country.

Notwithstanding the fact that the parties have negotiated the proposed PFS, and Plaintiffs have accepted many of Defendants' proposals and compromises (and vice-versa), the four (4) issues outlined above remain in dispute, and the PSC herein seeks to exclude and/or amend the above areas of questioning as outlined below.

<b><u>ARGUMENT</u></b>

**I.**     **<u>Calculations Concerning Plaintiff's Lost Wages</u>**

Section VIII, question 2 of the proposed draft PFS requests, in part, that Plaintiff state the:

> [t]otal amount of time and wages/money you believe you will
> lose in future wages or income, and a description of how
> you calculate or estimate your lost future wages or income.

The PSC has consistently objected to this question on the ground that it requires Plaintiff to subsume the role of an expert witness.

More specifically, the question calls for the expert opinion of an economist. Furthermore, such information will be the subject of expert reports and/or disclosures, which will be provided in accordance with Rule 26(a)(2) of the Federal Rules of Civil

Procedure and/or any further Order of the Court and/or an entered case management plan. This information is not properly directed at Plaintiff. The proper question to be directed to Plaintiff should be limited to the following: "Are you making a claim for loss of future wages or income? Yes _____ No _____."

Obviously, should Plaintiff respond in the affirmative to this question, said Plaintiff will have to support said claim with appropriate and ample expert opinion and documentary evidence, none of which should be required at this initial fact finding stage.

As such, the PSC respectfully requests that the second part of the question referenced above be removed from the Court-approved PFS.


II.     **Payments Made By Insurer on Behalf of Plaintiff**

Section VIII, question 4 of the proposed draft PFS requests information concerning moneys paid by Plaintiff's insurer on his or her behalf for the injuries he or she alleges to have sustained as a result of Defendants' NexGen knee system. Specifically, the question states:

> If you know, has your insurer paid or incurred any medical expenses related to any condition you allege was caused by a defective component(s) implanted in your knee.
>
> Yes ____ No___.
>
> If yes, state the total amount of medical expenses incurred, if known._____

The PSC submits that such information is not known by Plaintiff, nor can it be easily ascertained by Plaintiff.

Moreover, obtaining such information would require a detailed line-by-line analysis of each and every payment a third-party insurer has ever made on Plaintiff's

behalf, and an ultimate determination as to whether each particular payment was indeed paid out to cover injuries alleged in Plaintiff's Complaint. At this stage of discovery, such an analysis would be a waste of time, is unduly burdensome and is not an analysis that is properly undertaken by the Plaintiff, particularly because, in many cases, the full extent of Plaintiff's damages may not yet be known.

Additionally, both common sense and history tells us that any Plaintiff (or any person for that matter) that was hospitalized as a result of the condition alleged in their Complaint and/or PFS and/or hospitalized for a non-related condition, 99% of the time such a Plaintiff would have no information concerning any moneys paid on his or her behalf by his insurance carrier for said medical treatments. Further, in Section III of the draft PFS, Plaintiff is producing authorizations for collateral source information, which should provide Defendants with all the information they need to know. On these bases, Plaintiffs object to the inclusion of the above question on the PFS.

Notwithstanding the above, the PSC acknowledges Defendants' argument that this is essential information to aid in determining overall damages. However, the proper method to obtain this information is through collateral source records. To this precise end, Section III, Q. 1, of the proposed PFS asks Plaintiff to identify this information (and requires an authorization for same). As such, Section III, Q.1 is the very question that provides Defendants with the best access to this "essential information," and avoids requiring Plaintiff to make an absolute guess at a figure that he or she lacks the foundation or expertise to calculate regarding what his or her insurer paid for treatment.

III.     **Questions Directed to Loss of Consortium Plaintiffs**

Section X of the proposed PFS is directed toward the loss of consortium Plaintiffs, to the extent there is one named in a given lawsuit.  The PSC strenuously objected to questions directed towards the loss of consortium Plaintiffs, and respectfully requested that such questions be removed from the PFS.  To this end, questions and inquiries concerning the loss suffered by these Plaintiffs are more properly addressed through depositions.

As an initial matter, questions directed towards a loss of consortium Plaintiff in a PFS are highly unusual.  The PFS is traditionally a discovery tool that is directed to the Plaintiff who has suffered the physical injury from the use of Defendants' product.  Moreover, information concerning the physically injured Plaintiff, such as Plaintiff's healthcare providers, medications and/or product identification information, is the type of information which is conducive to being listed within charts and/or provided in a few sentences in response to specific PFS questions.

Conversely, the precise losses which a loss of consortium Plaintiff has experienced, including, but not limited to, loss of care, services, companionship, counsel, advice, assistance, comfort, consortium, or any similar loss, is not easily encapsulated in a few lines of text.  Rather, such questions are more properly and appropriately directed to the loss of consortium Plaintiff at his or her deposition, where the extent of such loss of services and consortium claims can be properly articulated and enumerated.  Moreover, the sensitive nature of such inquiries, including, but not limited to, the existence of any continued intimate relationship between the Plaintiff and the loss of consortium Plaintiff,

is information that the loss of consortium Plaintiff should not be required to disclose on a form.

While the PSC has agreed to accept the limited personal background questions in Section X, we cannot, and have not „greed to allow Question 3 remain in this Section.

As such, the PSC submits that Question 3 of Section X directed to the loss of consortium Plaintiffs should be removed from the PFS, as such information is properly discovered through deposition, if and when appropriate.

**IV.**     **Request for Plaintiff's Federal Tax Returns**

In Section XI of the proposed draft PFS (*i.e.*, the Document Request Section), sub-part 'L' requests the production of federal tax returns and W-2 forms for each of the last five years to the extent that Plaintiff claims to have suffered a loss of earnings, or lost earnings capacity.

The PSC objects to the categorical inclusion of federal tax returns in the production request meant to establish lost wages for all Plaintiffs. The PSC respectfully submits that W-2 forms provide the same earnings information that would be found on a federal income tax return; however, they do not contain additional sensitive and privileged information that is found on federal income tax returns.[3] On this basis, Plaintiffs respectfully submit that Plaintiffs should be entitled to produce W-2 forms in lieu of federal tax returns in order to demonstrate their lost earnings.

---

[3]   Of course, if a plaintiff does not receive a W-2 in his or her line of work (*i.e.*, he/she is an independent contractor or is in a sales/commission-based position), then he or she may in fact need to provide tax returns in order to substantiate and justify his/her lost earning claim. However, the PSC's position herein is that federal tax returns should not categorically be required for any and all plaintiffs asserting a lost wages claim.

Moreover, as noted above, the information that is often contained within a federal income tax return can be highly confidential, and often has no bearing on lost earnings claims. How, why and where a Plaintiff takes deductions is highly irrelevant and will not lead to the discovery of admissible evidence in any regard. Rather, such production is merely an effort by the requesting party to engage in a 'fishing expedition'.

More specifically, there are numerous pieces of confidential information contained within a tax return (*i.e.*, other parties' social security numbers, deductions and other private information) which are irrelevant to a claim of economic damages, and therefore should be prohibited by FED. R. CIV. P. 26(b)(1). This is especially true when a more convenient and less burdensome method of obtaining the requested information exists through exchange of W-2 forms and employment records. FED. R. CIV. P. 26(b)(2)(C)(i). *See Terwilliger v. York Intern Corp.*, 176 F.R.D. 214, 217 (W.D. Va. 1997) (where the court agreed that the plaintiff's wages were relevant for discovery, but that information such as investment income or plaintiff's spouse's income was not relevant. Therefore, tax returns were not compelled while W-2 forms and other evidence of wages were accepted).

While Plaintiff recognizes that there is no absolute privilege with regard to federal income tax returns, courts traditionally have been reluctant to allow access to them. *See e.g.*, *Gattegno v. Pricewaterhousecoopers, LLP*, 205 F.R.D. 70 (D. Conn. 2001); *E. Auto Distrib., Inc. v. Peugeot Motors of Am., Inc.*, 96 F.R.D. 147, 148 (E.D.Va.1982) ("a 'qualified' privilege emerges from the case law that disfavors the disclosure of income tax returns as a matter of general federal policy"); *Lieberman v. John Blair & Co.*, No. 86 CIV. 9077 (SWK),1989 WL 135261, at *2 (S.D.N.Y. 1989) ("qualified privilege attaches

to federal and state tax returns"); *Wisenberger v. W.E. Hutton & Co.*, 35 F.R.D. 556, 557 (S.D.N.Y. 1964) ("[u]nless clearly required in the interests of justice, litigants ought not to be required to submit such returns as the price for bringing or defending a lawsuit."); *See also O'Connell, et al. v. Olsen & Ugelstadt, et al.*, 10 F.R.D. 142, 143 (N.D. Ohio 1949) ("[income tax returns]… are, in private civil actions, confidential information between the taxpayer and the Government and should not be open to inspection…"); *United Motion Theatre Co. v. Ealand*, 199 F.2d 371 (6th Cir. 1952) (denying request for income tax returns); *Welty v. Clute*, 2 F.R.D. 429 (W.D.N.Y. 1939) (the production of income tax returns was disallowed where other sources of information would sufficiently show the income of the parties). The Court should be equally reserved about requiring disclosure of tax returns here.

Defendants rely on three cases within the Seventh Circuit in support of their position on the production of tax returns: *Camphausen v. Schweitzer*, 2010 WL 4539452 (N.D.Ill. 2010); *Scheffler v. County of Dunn*, 2009 WL 1249291 (W.D. Wisc. 2009); and *Fields v. G.M. Corp.*, N.D. Ill. 1996).[4] The two cases within the Northern District of Illinois involved claims with a more complicated measure of damages than the typical "loss of wages" claim that will likely arise in these cases. *Camphausen* was a defamation case in which the plaintiff claimed that the alleged statements "adversely affected his business prospects". *Camphausen*, at *2. This claim by necessity required a showing beyond the ordinary measure of loss of earnings for which a W-2 would be sufficient. Similarly, *Fields*, a breach of contract case, alleged lost profits for failure to offer

---

[4] The Seventh Circuit has addressed the issue of whether full tax returns are discoverable in *Poulos v. NAAS Foods, Inc.*, 959 F.2d 69 (7th Cir. 1991). The court declined to opine as to whether tax returns required an additional showing to be discoverable, finding that such a showing had been met in the case before it regardless of the standard. That court further noted that, in the case before it, "no reasonable alternative source for the information requested" was available. *Poulos*, at 75. Such is not the case here.

10

plaintiff a certain franchise for a Cadillac dealership and a defense of mitigation that required assessment of plaintiff's current dealership, which was owned through multiple subsidiary corporations. Here again, a simple W-2 form would not have provided defendants with adequate discovery as to the damages alleged, so additional disclosure was warranted.

Should any of the Plaintiffs' financial condition involve similar complexities, Defendants would, in those circumstances, be entitled to more than a W-2. However, as the vast majority of cases will not involve this level of detailed financial discovery and forensic accounting, W-2 s should serve as sufficient discovery as to lost earnings as an initial matter, rather than allowing categorical discovery of federal tax returns for all Plaintiffs who are asserting a loss earnings..

Accordingly, Defendants' blanket request to obtain an authorization for Plaintiff's federal income tax returns should be denied, or in the alternative, Defendants should be required to show some compelling reason why W-2 forms are insufficient to provide evidence of Plaintiff's lost earnings information.

## V.      The Dates in Proposed CMO 2 Should Be Modified (slightly)

Like the PFS, significant agreement has been reached in the accompanying CMO that would serve to govern production/timing of the PFS and the corresponding Defendant Fact Sheet ("DFS"). Indeed, having worked on these matters in many different pharmaceutical and medical device mass tort, multidistrict litigations, there was significant experience and examples to draw upon. As such, the proposed CMO mirrors greatly what was done recently in MDL-1742, *Ortho Evra Products Liability Litigation*,

MDL-2100, *In re Yasmin and Yaz (Dropspirenone) Marketing, Sales Practices and Relevant Products Liability Litigation*, and MDL-2197, *DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation*. Because of the successful discovery processes in those litigations, we greatly appreciate Zimmer's willingness to be guided by the exemplar CMOs in those cases that we provided.

Unfortunately, Zimmer will not agree to certain very modest timing extensions to in the proposed CMO. As set forth below, there are three (3) dates that remain at issue. For the reasons set forth below, and the interest of common sense, we respectfully request that the Court approve the timing proposed by the PSC, as accepting Defendants' versions will: (1) create a likely hardship and/or prejudice Plaintiffs (depending on which date is selected); and (2) embolden Defendants to be unwavering during future negotiations.

In sum, the few issues that remain in dispute are solely issues concerning the timing of Plaintiffs' actions. They involve allowing for modest amounts of additional time for certain required actions by Plaintiff that Defendants curiously *refused* to extend to Plaintiffs.

### A. 60 days versus 75 days

The first timing issue concerns the time required to provide a completed PFS for those cases that are already filed. *See* proposed CMO 2 at ¶ A.2. The PSC proposed 75 days. Defendants offered 60. That such a two-week or 15 day difference is in dispute is frankly, surprising. In contrast, the PSC freely provided Defendants 120 days for their DFS without objection or negotiation. Yet, Defendants would not provide a mere 15 additional days for Plaintiff to deliver the PFS?

The process of mailing out and receiving back a completed PFS takes time. In addition, the time to serve a completed PFS will run for all Plaintiffs at the same time, meaning Plaintiffs' counsel with more than one filed case will be undertaking to complete and serve all PFSs simultaneously. These logistical concerns demonstrate the importance of this additional time.

One additional reason why it is very important to have this extra time is because the PFS will not be sent to Plaintiffs until it is approved by the Court (sometime after December 12, 2011). This means Plaintiffs will receive the PFS the week before or the week of Christmas; arguable a time when many people are away or tending to family matters. As such, the extra week is surely justified for this reason alone.

Lastly, there is simply no prejudice for this request. Given the massive number of concessions Plaintiffs made in negotiating the PFS in good faith (and we acknowledge - the Defendants have made concessions too), we were surprised that this modest request was not acceptable and was a subject of this motion.

**B.**     **30 days versus 90 days**

The next disputed time issue concerns the time within which a case may be reinstated should it be dismissed without prejudice for failing to adhere to the PFS deadline. Defendants propose 30 days. *See* proposed CMO 2 at ¶ A.8.c. The PSC proposed 120 days; yet in effort at compromise, the PSC was willing to agree to 90 days. Without revealing the course of negotiations and where parties left off, it appears the gap is 90 and 30 days respectively. Notwithstanding, Plaintiffs still believe that 90 days is appropriate, and that a further compromise of 60 days is not necessary.

The class of Plaintiffs for whom this provision would ever apply are those whose cases have been dismissed for failure to provide a PFS. Indeed, these are people who did not provide a PFS within the 75 or 90 days allowed for, then did not respond to letter from Defendant's counsel, and then did not cure same during the pendency of a motion to dismiss, and as such, Defendants are now seeking to convert the motion for failure to prosecute (and the dismissal obtained therein) into a dismissal with prejudice.

While the number of cases that will ever fall into this category is likely going to be minuscule, the reason that we submit extra time is needed is because we want to be sure that proper notice is provided. We have learned that extra protections are required because if, in fact the Plaintiff does want to continue with their case and has not responded, the reason is usually because they are incapacitated in some way (*i.e.*, deceased). In these circumstances, the dismissal with prejudice that Defendants would like to seek so expeditiously will likely be moot, as would the work they did in trying to secure same. Instead, history has taught us that when converting a dismissal without prejudice to one with prejudice, the better course – so as to ensure all due process and notice has been complied with – is to allow for more time to find/locate the Plaintiff one last time and verify that they do in fact no longer wish to carry on their claim. Indeed, a dismissal with prejudice for a dead or otherwise incapacitated (*i.e.*, hospitalized) Plaintiff is nullified, as the Court has no jurisdiction to entertain the dismissal.

It is for this reason alone that the PSC proposed the extra time. We do not do so to delay the litigation in any way, but rather to be sure all procedural safe-guards have been satisfied. Hence, there is absolutely zero prejudice for Defendants to allow this time to be 90 days.

14

**C.**     <u>January 6, 2012 versus January 13, 2012</u>

The last timing issue in the proposed CMO concerns the time when authorizations would be due for cases where Automatic Disclosures were already served. *See* proposed CMO 2 at ¶ A.3.

Simply put, Defendants proposed January 6, 2012. The PSC proposed January 13, 2012. In this regard, the PSC advised Defendants that the first week of January following Christmas/holiday breaks was traditionally problematic for mail, and that it would be more prudent to make the authorizations due January 13, 2012 (one week later). Once again, Zimmer would not agree to the additional seven days.

The PSC submits no great legal precedent for the request, but rather relies on our experience and common sense.

While we appreciate Zimmer's potential response that we too should be reasonable and negotiate, the difference of seven days, for the legitimate reason we propose should not be cause for further negotiation. We know the authorizations are due and must be provided, we simply want to provide them efficiently and avoid any potential issues (namely letters from Defense counsel that various Plaintiff lawyers failed to tender authorizations on January 6, 2012). Instead, our view is that one extra week (especially given this time of year), will in no way prejudice Defendants, and is the more prudent course.

Indeed, during one of the many meet-and-confers, Defendants' counsel acknowledged that she has just one client. In this regard, Plaintiffs' counsel represent many, many clients. Sending, receiving, and executing authorizations, and then tendering

same to Defendants is not complex, but it certainly takes time. And during the holiday weeks, it takes a bit more time. To this precise end, our experience dictates that getting paperwork back takes slightly longer. Plaintiffs are not looking for months, or even weeks. Plaintiffs seek seven days. I

For the simple reasons set forth above, the PSC respectfully requests that the additional seven days be granted and that Plaintiffs have until January 13, 2012 to serve duly executed authorizations for relevant healthcare providers identified in their automatic Disclosures.

## **CONCLUSION**

For the foregoing reasons Plaintiff respectfully requests that an Order be entered resolving the PFS disputes, and approving a finalized PFS for use in MDL 2272 that does not permit the above questions.

Dated: December 8, 2011     Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

*/s/ Michael A. London*_____
MICHAEL A. LONDON (ML-7510)
111 John Street, Suite 1400
New York, New York 10038
Ph: (212) 566-7500
Fax: (212) 566-7501
Email: mlondon@douglasandlondon.com
Attorney for Plaintiffs