# EXHIBIT 5

```
                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                             EASTERN DIVISION


   IN RE:  ZIMMER NEXGEN KNEE     )   Docket No. 11 C 5468
   IMPLANT PRODUCTS LIABILITY     )
   LITIGATION,                    )
                                  )
                                  )   Chicago, Illinois
                                  )   April 12, 2012
                                  )   10:00 a.m.


                TRANSCRIPT OF PROCEEDINGS - Motions
             BEFORE THE HONORABLE REBECCA R. PALLMEYER

   APPEARANCES:

   For the Plaintiffs:    JOHNSON BECKER PLLC
                          BY:  MR. TIMOTHY BECKER
                          33 South 6th Street, Suite 4530
                          Minneapolis, Minnesota  55402

                          ANAPOL SCHWARTZ
                          MR. JAMES R. RONCA
                          1710 Spruce Street
                          Philadelphia, Pennsylvania  19103

                          FOOTE, MEYERS, MIELKE & FLOWERS, LLC
                          BY:  MR. BRIAN J. PERKINS
                          3 North Second Street, Suite 300
                          St. Charles, Illinois  60174

                          POGUST, BRASLOW, MILLROOD
                          BY:  MR. TOBIAS L. MILLROOD
                          161 Washington Street
                          Conshohocken, Pennsylvania  19428


   For the Defendants:    FAEGRE BAKER DANIELS, LLP
                          BY:  MR. JOSEPH H. YEAGER, JR.
                          300 North Meridian Street, Suite 2700
                          Indianapolis, Indiana  46204

                          FAEGRE BAKER DANIELS, LLP
                          BY:  MR. KYLE OSTING
                               MS. ABIGAIL M. BUTLER
                          111 East Wayne Street, Suite 800
                          Fort Wayne, Indiana  46802
```

```
 1   APPEARANCES (Continued):

 2
                              FAEGRE BAKER DANIELS, LLP
 3                            BY:  MR. KURT E. STITCHER
                              311 South Wacker Drive, Suite 4400
 4                            Chicago, Illinois 60606

 5
     Also Present:            Mr. Robert D. Rowland
 6                            (telephonically)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:          FRANCES WARD, CSR, RPR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Suite 2118
                              Chicago, Illinois  60604
25                            (312) 435-5561
                              frances_ward@ilnd.uscourts.gov
```

1  protective order on third parties, we pretty clearly heard
2  you say that the objection that Zimmer had, at least as it
3  related to discovery, was overruled.
4          THE COURT: Well, I did say that. But let me
5  clarify what I understood we were talking about. I thought
6  what we were talking about was third-party discovery.
7          MR. BECKER: We were.
8          THE COURT: And it seemed to me that there was a
9  great deal of utility in simply overruling the objection
10 because, otherwise, we were going to tie up third-party
11 discovery for a long period of time. There was no
12 indication, as far as I could tell, that third parties were
13 in any genuine distress about the idea that their production
14 should go beyond the 5950.
15         Zimmer feels differently about it for reasons that
16 I think probably make sense. And I do think that I am
17 governed in this case by the scope of the MDL order, which I
18 thought limits the MIS tibial aspect of the case to the 5950.
19         Now, that doesn't necessarily mean that there would
20 be no other production. But I would expect that any other
21 production would -- the material produced about any other
22 components would illuminate issues relating to the 5950 in
23 some way. And there would have to be some kind of
24 articulable description of that -- of why these other
25 materials relate to claims involving the 5950.

1        I don't know whether that's clear. But I guess
2 what I am saying with respect to this dispute,
3 Paragraph III(c)(4) of the proposed CMO 3, I would likely
4 adopt plaintiffs' proposal and make it "s," components, but I
5 don't think that that should be viewed as a victory for
6 plaintiffs on this issue because I still think it ought to be
7 limited to components that somehow have a direct involvement
8 with the 5950.
9        Obviously, 5950 documents, and maybe there are
10 other tibial components that have the same design or were
11 constructed at the same time or were created for the same
12 reason and that's why the design documents would have --
13 would be completely overlapping.
14        MR. BECKER: Here is what we understand to be true.
15        THE COURT: All right.
16        MR. BECKER: And I think I hear what the Court is
17 saying.
18        At one of the last status conferences -- I don't
19 know if it was the one before, at the semiscience day --
20 Mr. Yeager showed you a chart of all of the various parts and
21 components and tibial parts and femoral parts and patellar
22 knobs that Zimmer manufactures.
23        Within those components there is a subset, as we
24 understand it, of MIS tibial components. And then, within
25 that family there is a subset of MIS tibial components that

1 have different serial numbers. The recall implicated the
2 5950.
3     Mr. Ronca has a case involving the --
4     MR. RONCA: 5954.
5     MR. BECKER: -- 5954, which was also part of a
6 recall.
7     There are other MIS tibial components, all of which
8 are designed to be used in connection with the NexGen system,
9 and in particular, as we understand it, the High-Flex system.
10     We have a burden in this case that they are going
11 to strenuously make us prove, that the mechanism of failure
12 was, in fact, the Flex knee or potentially the tibial
13 component.
14     We need to know, especially since a component of
15 our case involves the MIS surgical procedure, which is used
16 in connection with MIS tibial components and High-Flex
17 femoral components, how those particular components
18 interreacted.
19     We are not asking to go beyond MIS types of tibial
20 trays. We are simply saying we are already going to be doing
21 the discovery on the MIS 5950. We believe that the other
22 components are interrelated to that.
23     And whether or not those cases ever get tried or
24 heard in this MDL doesn't mean that the scope of Rule 26
25 discovery is so narrow that we can only talk about the 5950,

1  particularly if the other MIS tibial trays are intended to be
2  used, as we understand them to be, in connection with the
3  femoral components that are at the heart of this case.
4  　　　　So all we proposed was this:  In connection with
5  taking this deposition, the core of which will focus on the
6  5950 and the MIS surgical procedure, which nobody disagrees
7  about, why wouldn't we also look at other MIS tibial trays
8  that are used in connection with the femoral components to
9  figure out, in order to prove our case, what the mechanism of
10 failure was?
11 　　　　So it is not as if these parts have no
12 interrelationship with one another.  They are designed, as we
13 understand it with our limited view of their document
14 production, with the limited documents that we have been
15 given to date, that the MIS tibial trays are designed to be
16 used in connection with High-Flex femoral components and the
17 MIS surgical procedure.
18 　　　　That's why we think it's relevant.  That's why we
19 think we should get the deposition.
20 　　　　And maybe we will come out of that deposition and
21 say, look, Zimmer was right.  This is a 5950 case.
22 　　　　Or maybe we will find out what we suspect to be
23 true, which is that all MIS tibial components have a
24 similar-type design, are intended to be used the same way,
25 and should be part of this case.

1    THE COURT: Response?

2    MR. YEAGER: Your Honor, the Court, I think,
3 correctly observes what the JPML -- I will start at the
4 beginning -- what the JPML order said. I don't have this
5 blown up, but I could write it down.

6    The Court describes the allegations in the cases
7 that it was transferring as "allegations that Zimmer's
8 High-Flex femoral components" -- defined ones we have talked
9 about in this case -- "and/or the MIS tibial component" --
10 footnoted to a footnote that a name -- a name that equates to
11 the 5950, a specific name -- "are prone to premature
12 loosening."

13    So number one, the panel said this case is about a
14 collection of cases where the Flex femoral components
15 identified or the 5950, not the other MIS tibial components,
16 are prone to loosening, not the additional theory that's now
17 been discussed in this court after the JPML, that there is
18 some systemic failure; that a femoral component, a Flex
19 femoral component, can cause some other component to loosen.
20 That was not in the case then. I know it's been discussed
21 now.

22    Just to respond or maybe to clarify Mr. Becker's
23 comments with regard to what MIS tibial components may mean,
24 obviously to the JPML it meant the 5950. Every case that was
25 before it with a tibial component was a 5950 except the

1  *Krammes* case that was just referred to.
2          So let me talk for a moment about the differences
3  in those because I think this goes to the plaintiffs'
4  argument that even though the 5950 is the one in the case,
5  they ought to get discovery on other tibial components.
6          I have a small -- excuse me.  If I could get my
7  chart?
8          THE COURT:  Sure.
9          (Brief pause.)
10         MR. YEAGER:  This is the chart I think that
11 Mr. Becker was referring to.  On the left side we have the
12 femoral components, and I have put check marks by the ones
13 that are in the JPML order that we are not arguing about
14 right now.
15         And then here are all the different tibial
16 components that are part of NexGen.
17         And then here is the one, the 5950, okay?
18         Now, the TM tibia is next to it, called TM tibial
19 tray.  So just to talk about the similarities and differences
20 in those two for a moment, because those are the ones that
21 Mr. Becker was referring to, I think it's a good comparison.
22         As the Court can see -- and if the Court would like
23 me to bring this up, I can -- the 5950 has a keel, a short
24 keel, on it, and then it has these optional drop-down stems
25 that attach.

1  THE COURT: Right.

2  MR. YEAGER: And that's the part of the dispute, I
3  think, on that. And that sets them into the component.

4  The TM tibial tray -- "TM" stands for trabecular
5  metal. It is a completely different method of affixing that
6  tibia to the bone -- that tibial component to the bone.
7  Trabecular metal is this really quite remarkable -- almost
8  like a metal foam. And it allows ingrowth. It's modeled to
9  look like bone and act like bone and have kind of mechanical
10 qualities like bone, and it allows bone to ingrow. One does
11 not typically use cement on that. It's a press-fit and then
12 there is ingrowth.

13 And instead of having a drop-down stem, there is no
14 drop-down stem. There are four pegs -- or I think three pegs
15 on that tibial tray.

16 There are similar differences between the 5950 and
17 the other tibias that one sees here. As the Court has
18 observed, there is no doubt that the one that was at issue
19 before the JPML was the 5950. The Court had not even heard
20 about the TM tibial tray. It was not apparent from the
21 complaint that it was some other tibial component at that
22 point. And that's why the *Krammes* case with the TM tibia is
23 one of the subjects of our motion for remand.

24 If the Court were to accept the notion that any of
25 these other tibias that might be used with an MIS process --

1   not all of them are suitable for MIS processes, but several
2   are. If the Court were to accept that notion, then we would
3   have -- instead of the femoral components that the JPML
4   listed and the 5950, we would have at least three more
5   products, four of which we would have to do design files, all
6   the other files, and all the other discovery, which very
7   substantially would expand the scope of discovery for
8   products that aren't even in the case, your Honor.
9         If they can establish a parallel -- if there is a
10   predicate device, for example, that would be different. We
11   have already agreed if there is a predicate device in the
12   510(k) approval that shows where we said something is
13   substantially identical, of course we will produce a design
14   file on that. We have already agreed to do that.
15         But to expand it wholesale in the way that's being
16   sought here, there is no basis for it.
17         And the products are, as the Court can see, quite
18   different.
19         THE COURT: I do want to see the chart for a
20   moment.
21         (Document tendered.)
22         THE COURT: I need to ask -- I am holding up the
23   chart now, and there's these purple checkmarks.
24         MR. YEAGER: Those are mine, your Honor. I was
25   marking the femoral components that are part of the order.

1       THE COURT: As well as this one tibial component.
2       MR. YEAGER: That column -- it's repeated at other
3   points in that column, but that's the --
4       THE COURT: Your purple checkmarks should also
5   include these (indicating).
6       MR. YEAGER: Yes. I could have checked those.
7   They are just repetitions of the same product.
8       THE COURT: All right. Indicating, for the record,
9   the other MIS tibial tray photos that include the three
10  options, I guess, for implanting.
11      All right. I guess one other question I have is,
12  tell me whoever it is out there who's on the ground doing
13  this discovery, who's actually pulling these documents and
14  putting them together, are they maintained in such a way that
15  there really is some discrete division on design files for
16  each of these types of items?
17      MR. YEAGER: Yes. Each product has its own design
18  file, and they each have separate design files. So we are
19  doing at least a couple of things, and I will let my
20  colleagues add in to the extent I don't get this exactly
21  right.
22      The design files for each product, which we have
23  long ago produced, and other files that are specific to each
24  product.
25      In addition to that, as the Court has heard a lot

1  about, we are in the custodial file production. So in the
2  custodial file review, we have gone to -- and we have taken
3  the 100 custodians that have been identified by the
4  plaintiffs and searched their files -- in addition to these
5  other files, searched those custodians' files for files that
6  relate to any of these products that are on the JPML list.
7        So we have done at least those two things. If
8  there is something else we should comment, maybe Ms. Butler
9  could add.
10       MS. BUTLER: Your Honor, I assume -- it's been my
11 observation that in handling these cases, both when it's just
12 a single case and in this MDL, each project -- each product
13 has its own project history file which documents day one from
14 the design until release.
15       They are going to have different design teams and
16 separate custodians. So are we now going to have some sort
17 of auxiliary or separate custodian list that we are also
18 going to have to produce documents from?
19       So in my opinion, I think that there will be maybe
20 a little bit of overlap, but a lot of it's not overlap.
21       MR. BECKER: Your Honor, may I be heard on that?
22       THE COURT: Yes.
23       MR. BECKER: Judge, I can tell you I have been
24 spending a lot of time with the documents, and it struck me
25 as odd when the defendants made the argument in front of the

1 JPML and then when they came in and made the argument here
2 that there are these, quote/unquote, separate design teams
3 with separate files.
4 And it is true that each product has its own design
5 history file and project file. Based on what we have seen,
6 those total somewhere between five to seven thousand pages
7 for the entire compilation.
8 You will remember the 32 bullet points were
9 supposed to produce roughly 40,000 pages for what they
10 referred to as eight separate categories of documents.
11 THE COURT: Right.
12 MR. BECKER: So just extrapolating from there --
13 and I understand how dangerous that is -- we are certainly
14 not talking about a significant number of pages.
15 Secondly, what I can tell you, because I am
16 spending a lot of time on the documents, this company runs
17 its company like all companies do; and that is, it builds off
18 the efficiencies and the synergies of prior knowledge.
19 And so what you will see when we start talking
20 about merits discovery and when we actually get there is that
21 it's not as if they start over with every single device.
22 There are people who run through all of the femoral
23 components that are on the custodial file list. There are
24 design people who started off as engineers and get promoted
25 to design team leaders through the course of their career.

1     So the notion that there are eight different design
2  teams or five or six or ten that are completely detached from
3  one another is simply and fundamentally false.
4     In fact, at one point when we were identifying our
5  custodial lists -- and I didn't think their argument was
6  going this way today -- we had prepared a document tracking
7  how much overlap there was. And there is considerable
8  overlap, which makes sense. Why would a corporation do it
9  any other way?
10     THE COURT: They wouldn't. But that doesn't
11  necessarily translate for me into a determination that I
12  should make this discovery so broad as to include but -- not
13  so broad, but to expand it to include all the MIS tibial
14  components.
15     MR. BECKER: Let me respond to the merits of that
16  argument. I was responding to the facts that they were
17  raising.
18     One, the footnote that defendants love to quote
19  starts with, "Zimmer's stated position is." Now, I don't
20  have the order in front of me, but I believe that's what it
21  says.
22     The second thing is that the JPML takes a position
23  as a snapshot in time of what is before it.
24     Many, many, many MDLs expand to include different
25  products that people did not originally know would be in

1   play. And recognizing that -- and I am going off of memory
2   here -- the JPML specifically instructed you as the
3   transferee court to guide us in how discovery would roll out.
4            THE COURT: And I intend to do that. I want to
5   make that clear. I intend to do that.
6            But remember, the most significant concern the
7   plaintiffs have had up until now is that there has been
8   insufficient production of documents of all kinds.
9            MR. BECKER: Let's split the difference, then. We
10  are not asking right now for them to produce design files or
11  custodial files or anything like that.
12           We are talking about a couple of hours within a
13  30(b)(6) deposition that we can explore how relevant the
14  interrelationship of these are. And if Zimmer comes back
15  with the position and we are satisfied with it that, look,
16  these products have nothing to do with one another, we have
17  no need to push that.
18           THE COURT: I think I can resolve that issue by
19  saying that whenever I have discovery disputes regarding
20  depositions, I don't -- it's extremely unusual for me to --
21  and I wouldn't in this case -- limit the subject matters that
22  you can cover. You can ask the witnesses any questions you
23  want.
24           What I do often impose is time limits. And I think
25  that tends to focus the mind.

1   So at this point I am going to sustain the
2 objection -- the defendants' position on Subparagraph (4) and
3 recognizing that that's without prejudice to what questions
4 might be asked at a deposition. And I will make that clear
5 as well, that I am expecting that when depositions are taken,
6 there will not be subject matter objections.
7   MR. BECKER: Just so I am clear, because the whole
8 paragraph relates to depositions only --
9   THE COURT: Oh, I thought it was production --
10   MR. BECKER: No, it's only depositions. It's a
11 30(b)(6) deposition.
12   THE COURT: Oh. I will still make it component,
13 and you will produce -- the witness will be produced, and you
14 are welcome to ask that witness any question you want.
15   MR. BECKER: Fair enough. Thank you, Judge.
16   THE COURT: All right. Okay.
17   MR. BECKER: The next argument relates to
18 Paragraph IV(c), which is location of depositions.
19   THE COURT: You know, this one -- this is a pretty
20 straightforward issue. I guess I am a little surprised that
21 there would be a dispute about it.
22   Let me just ask this question: Am I correct in
23 assuming that if the depositions happen in Fort Wayne, there
24 will be, at most, one nonstop per day?
25   MR. BECKER: Yes.