UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ZIMMER NEXGEN KNEE | ) | MDL No. 2272 |
| IMPLANT PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Master Docket Case No. 1:11-cv-05468 |
| | ) | |
| This Document Relates To All Cases | ) | Honorable Rebecca Pallmeyer |

**PLAINTIFFS' FURTHER RESPONSE OPPOSING ZIMMER'S MOTION
CONCERNING CONTACT WITH TREATING PHYSICIANS**

NOW COME the Plaintiffs, by their counsel, and file the following further response in opposition to Zimmer's attempt to conduct ex parte communications with Plaintiffs' treating physicians for the purpose of engaging them as retained experts:

**INTRODUCTION**

At the June 21, 2012 hearing on Zimmer's motion the Court indicated it was "not satisfied that the evidentiary record supports the conclusion that Plaintiffs' treating physicians are presumptively Defendant's first choice for expert consultation."[1] Subsequently the Court allowed Zimmer to file a supplement to its motion and allowed Plaintiffs' to file a further response.[2] Since then the parties have engaged in a meet and confer at which time Zimmer indicated that it may seek permission to have ex-parte access to many more of Plaintiffs' treating physicians in addition to the six identified by Zimmer to date. It remains unclear the extent of relief sought by Zimmer and, therefore, Plaintiffs' request additional oral argument on this matter so Zimmer can explain to the Court its true intentions.

---

[1] Docket Entry 532.
[2] Docket Entry 553.

Plaintiffs urge the Court to deny Zimmer's motion in its entirety. Should the Court grant Zimmer's motion as to any physician, than Plaintiffs must be allowed compliance with subpoenaed document production from each doctor and a complete fact witness deposition of each physician prior to any ex-parte contact by defense counsel. Zimmer must not be allowed to avoid full discovery of past events and historical documents under the ruse of a consulting expert privilege.

This Court directed specific questions to Zimmer that remain unanswered:

> "I think what we need to know is, how many true experts are there out there? Let's find out how many true experts there are. Plaintiffs say, look, there are 25,000 surgeons. Defendants say, no, it's a much, much smaller group. Let's find out how many there are." [3]

The Court advised Zimmer that Zimmer needed to provide an evidentiary record to support its motion:

> "So it seems to me that we ought to start there and determine how large that group is and find out what the overlap is before we conclude that I don't need to worry about any of the *Petrillo* issues and you can go forward talking to these people. I guess I think this is -- I need more of an evidentiary record on this issue before I can rule." [4]

Rather than supplementing the record with evidence demonstrating how its defense would be compromised absent ex-parte contact with Plaintiffs' treating physicians, Zimmer again provides nothing more than conclusions and generalizations to support its claim that it needs to engage in ex parte communications with every one of Plaintiffs' doctors. Plaintiffs are

---

[3] Transcript page 122, July 6, 2012

[4] Transcript page 124, July 6, 2012

concerned that if this Court grants Zimmer any relief that Zimmer will seek to expand its quest to include all of Plaintiffs' treating doctors.[5]

For purposes of this motion, Zimmer identifies six "Design Surgeons" as "physicians with whom Zimmer has an immediate and critical need to communicate as both fact witnesses and potential experts."[6]  Lacking any details, this Court and the Plaintiffs are left to speculate as to what "unique knowledge and information central to Zimmer's defense" these doctors possess.[7]

The Plaintiffs agree that the six doctors referenced may be critical fact witnesses, but not necessarily as to design issues.  Rather, these "Design Surgeons" are critical fact witnesses as to Zimmer's marketing of the *NexGen* Knee Products ("Products") and most likely have actual knowledge as to how and when Zimmer learned of the Products' deficiencies.

As is well known to Zimmer, Dr. Berger terminated his relationship with Zimmer years ago and has since been a vocal critic of the Products.  As reported by the New York Times in an article published in June 2010[8]:

> For years, Dr. Richard A. Berger designed surgical tools and artificial joints for Zimmer Holdings, trained hundreds of doctors to use its products and talked it up wherever he went. In return, Zimmer, an orthopedic implant maker, helped enrich Dr. Berger, portraying him as a master surgeon and paying him more than $8 million over a decade.

> Those days are gone. Dr. Berger started complaining to Zimmer a while back that one of its artificial-knee models was failing prematurely, and he went public recently with a study that he says proves it. Zimmer told him that the problem was not the artificial knee, but his technique, and pointed to data overseas indicating that the knee was safe.

---

[5]Although Zimmer's brief specifically references six "Design Surgeons", footnote 1 on Page 1 of its Supplement promises that in the future: "Zimmer will provide additional evidence and move the Court to lift the continuance on the Motion as to other treating physicians…"

[6]Footnote 1 on Page 1, Zimmer's Supplement.

[7]Page 2, Zimmer's Supplement.

[8] Copy of New York Time article is appended as Exhibit 1.

Last year, Zimmer did not give Dr. Berger a new contract. The company says it routinely rotates consultants.

"I trained hundreds of doctors for them and made them tens of millions," Dr. Berger said in interview here, in which he also lambasted Zimmer executives as dissembling, out-of-touch bureaucrats. "So was this just a coincidence? Maybe it was. Maybe it wasn't."

Zimmer's counsel has suggested to Plaintiffs' counsel that compliance with subpoenas on these six surgeons must await the outcome of this motion as Zimmer intends to engage the Design Surgeons as its experts and possibly act as their legal counsel. If Zimmer is allowed to proceed as it desires, Plaintiffs legitimate discovery of essential facts will be thwarted. The Court should now recognize that Zimmer's ruse seeks nothing less than turning the physician-patient privilege completely on its head and a blatant attempt to turn a potentially critical fact witnesses into a retained consulting experts.

It is also quite troubling that Zimmer would consider hiring as expert witnesses the physicians that it may litigate against in the future. In fact, Dr. Scuderi is currently in litigation with Zimmer in the USDC of Delaware in case 1:10-cv-00772. Dr. Scuderi's case has recently completed a multi day bench trial and was referred to mediation. The first mediation session is to commence July 27, 2012. [9]

In the Plaintiffs' litigation, one of Zimmer's stated defenses is doctor error. [10] In other words, Zimmer believes in many cases that the *cause* of the revision is the implanting doctor's neglect. Conversely, a treating doctor may argue that the product was defective. The existence of these diametrically opposed positions places the relationship between Zimmer and all

---

[9] Copy of Scuderi's Complaint and last scheduling order are appended Exhibit 2.

[10] *See Zimmer Entities' Position Statement*, Doc. No. 209 at 8-9.

implanting surgeons squarely at odds. Even more disturbing are the ethical implications of Zimmer's counsel providing legal services for the treating doctors. Rule 1.7 of the Model Rules of Professional Conduct, which has been adopted by every state dictate that such dual representation would be strictly prohibited as a non-waivable conflict of interest.[11]

## ARGUMENT

### I.      Zimmer Has Provided The Court With Little Evidentiary Support For Its Motion

Contrary to the express directions of the Court, Zimmer's supplement provides little, if any, evidentiary support for its claimed need to engage in ex-parte communications with Plaintiffs' treating physicians. Zimmer merely recites that six named physicians were "Design Surgeons" on certain Zimmer components. Zimmer explains that Design Surgeons are "surgeons with whom Zimmer contracted to assist in the development of the *NexGen* Flex Femoral Components and the 5950 MIS Tibia." Zimmer then repeats, without evidentiary support, its mantra that the six surgeons "possess unique knowledge and information central to Zimmer's defense."[12]

Zimmer does not explain:

1.  Exactly what is a Design Surgeon?  What did they do, if anything, in the process of designing the *NexGen* Knee Products?

2.  How many other surgeons are Design Surgeons and/or consultants for Zimmer in regards to the *NexGen* Knee Products?  Are there just six or dozens or one hundred?

---

[11] **Rule 1.7 Conflict Of Interest: Current Clients** (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
[12] Page 1, Zimmer Supplement.

3. What makes the six surgeons disclosed by Zimmer so special? What are the facts as to each surgeon?

4. What is the "unique knowledge" that the each surgeon possess?

Despite this Court's invitation, Zimmer fails to provide any details which would assist in understanding the critical questions as to how many qualified experts exist in this field and what is the overlap with Plaintiffs' physicians. Zimmer fails to provide any basis for its assertions that the six named surgeons possess unique information and, equally important, that any information known to these surgeons is not already fully know to Zimmer. Nor does Zimmer suggest any reason why this information would need to be kept as a secret from the Court or the doctors' patients.

Plaintiffs' counsel has substantial experience litigating medical device claims and has learned that most medical devices have several dozen consulting doctors or so called "design surgeons." These surgeons typically provide little, if any, actual design assistance for the device. Rather, the surgeons are paid royalties, stipends or other forms of compensation to assist the manufacturer in marketing the device. Such surgeons rarely have unique or special knowledge about the design process but typically have inside knowledge (potentially helpful to Plaintiffs) about how the manufacturer marketed the device and subsequently how the manufacturer became aware of the product's deficiencies.

Zimmer cannot seriously contend it lacks consultants and must use Plaintiffs' treating doctors. As a consequence of investigation by the Department of Justice, Zimmer entered into a Deferred Prosecution Agreement which mandated disclosure of Zimmer's extensive list of consultants and amounts paid to each YTD as of October 31, 2007. Zimmer disclosed over 500

paid consultants with many receiving payments for 2007 in excess of one million dollars.[13] Admittedly, many of those consultants may not be knee specialists but their sheer number and mind boggling payments demonstrate that Zimmer has many options and need not rely on Plaintiffs' treating physicians.

Zimmer lists no less than twenty eight "Zimmer Institute Faculty" for its current *NexGen* RH Knee device.[14] That device may not be identical to the *NexGen* Flex Femoral Component involved in this litigation; however, Zimmer does acknowledge on its website that the RH Knee has "the same patella-femoral design as the other *NexGen* Femoral Components."[15] The very existence of the Zimmer Faculty Institute demonstrates that Zimmer has, at the very least, dozens of prospective experts to choose from.

Despite this Court's clear direction, Plaintiffs respectfully submit that Zimmer has utterly failed to provide evidentiary support for its motion to engage in ex-parte communications with Plaintiffs' treating doctors. For this reason alone Zimmer's motion should be denied.

## II.   A State by State Legal Analysis Supports Plaintiffs

Although not requested by the Court, Zimmer purports to provide the Court with a state by state analysis of law in support of it motion. As will be shown, the laws and appellate decisions of Pennsylvania, Utah and Illinois do not support Zimmer's motion.

### A.  Utah Would Not Allow Ex Parte Communications With Dr. Hoffman

Zimmer has paid Dr. Aaron Hoffman to act as a Design Surgeon in connection with launching the Gender Specific Product line. Throughout the discovery process, Plaintiffs have

---

[13] Copy of disclosure of paid consultants is appended as Exhibit 3.

[14] Copy of the Zimmer Institute Faculty is appended as Exhibit 4.

[15] Copy of Gender Specific Knee webpage appended as Exhibit 5.

repeatedly requested 1099s for all Design Team surgeons, including Dr. Hoffman; to date, Zimmer has failed to produce these documents. One reason for this is that those 1099s will reveal that Dr. Hoffman received millions of dollars for his "consulting services" on the Gender Solution product line. In fact, the Consent Decree between Zimmer and the Department of Justice shows Zimmer paid Dr. Hoffman in excess of $4,299,000 for services in 2007 alone. Plaintiffs do not yet know the total compensation paid by Zimmer to Dr. Hoffman.

Now, Zimmer wants to retain Dr. Hoffman as an expert to opine on the safety and efficacy of the Gender Solution CR and LPS Flex Femoral Components.[16] Zimmer makes this request knowing that Dr. Hoffman—who practices medicine in Utah—treated one of the plaintiffs in MDL 2272. *Zimmer Supplement* at 8. Nonetheless, Zimmer assures this Court that Dr. Hoffman's interaction with Zimmer will not bias his care toward his patient *despite the fact* that he most likely receives both *on-going* royalties from each and every Gender Solution unit Zimmer sells and substantial compensation as a testifying or consulting expert.

The Utah Supreme Court directly confronted this issue in *Sorensen v. Barbuto*, 177 P.3d 614 (Utah 2008). In *Sorensen,* like here, the defendant encouraged the Court to step through the looking glass, contending that it could devise a communication scheme that allowed the doctor to testify against the plaintiff/patient's interest, while at the same time not damaging the doctor-patient relationship. The Court flatly rejected the argument holding that information a treating physician has that is in *any way* relevant to a judicial proceeding may *only* be obtained through general discovery. *Id.* at 620. Plainly stated, *ex parte* communications of the type Zimmer proposes are prohibited in Utah. *Id*.

---

[16] *Supplement To Zimmer's Motion For An Order Concerning Zimmer's Contact With Treating Physicians— Zimmer's Design Surgeons*, MDL No. 2272 at 1 (N.D. Ill. July 10, 2012), hereinafter "Zimmer Motion".

The Utah Supreme Court opined "that permitting *ex parte* communications between a treating physician and an opposing counsel would make it impossible for a patient or a court to appropriately monitor the scope of the physician's disclosures." *Id.* Just like "[a] physician is likely not trained to know what information can be disclosed[,] . . . [c]ounsel in a position adverse to the patient *is an equally unreliable advocate* for the patient's interest" when opposing counsel conducts *ex parte* interviews of plaintiff's treating physician. *Id.* (emphasis supplied). Here, the purpose of these *ex parte* communications is ostensibly to gather information central to Zimmer's defense. *Zimmer Supplement* at 1-2. Whether Dr. Hoffman is made aware of plaintiff's pending lawsuit against Zimmer is irrelevant as any information divulged regarding Zimmer's liability, his own potential liability as the implanting surgeon, or the plaintiff's specific case can be, and must be, obtained through normal discovery methods because they are all equally relevant to these judicial proceedings. *Sorensen*, 177 P.3d at 620. In short, it is impossible for Plaintiff's counsel, or this Court, to monitor everything discussed or disclosed during these *ex parte* interviews.

Ultimately, neither the treating physician, nor opposing counsel, is a reliable advocate for the plaintiff's best interest. *Id.* Zimmer has made clear that these discussions will center on facts and circumstances directly at issue and relevant in the plaintiff's case (i.e. - whether the Zimmer *NexGen* Knee was defectively designed). *Zimmer Motion* at 1-2. As such, allowing Zimmer to engage in this type of communication will only result in *more motion practice* as Zimmer endeavors to shield its communication with Dr. Hoffman under the cloak of the work-product privilege regarding pertinent *facts* related to his work on the Gender Solution Design Team. For this reason alone *ex parte* interviews are improper. See: *Sorensen*, 177 P.3d at 620.

Regardless of the intent or wording found in Zimmer's proposed order, the Utah Supreme Court explicitly prohibits tinkering with the doctor-patient relationship stating: "*ex parte* communications between a former or current treating physician and counsel opposing a patient in court are prohibited. " *Id*. This holding precluded *any* opportunity for defense counsel to conduct *ex parte* interviews with plaintiff's treating physician about *any* subject relevant to judicial proceedings. In fact, the Court expressly held, "[T]he information held by a physician that is relevant to a judicial proceeding may be obtained *only* through traditional methods of discovery." *Id.* (emphasis added). None of this, of course, is disclosed within Zimmer's brief. The reason for this is because Zimmer knows that Dr. Hoffman possesses information relevant to both his the development of the Gender Solution product line *and* treatment of the plaintiff. Whether Zimmer's business relationship with Dr. Hoffman pre-dates the design of Gender Solution products, or his treatment of the plaintiff, is irrelevant to the issue of *ex parte* communication because it bears directly on his care of the patient. Accordingly, if Zimmer wishes to obtain any information relevant to the instant litigation they must use traditional discovery methods as opposed to *ex parte* interviews. *Id.*

**B. Pennsylvania Does Not Allow Ex-Parte Communications With Dr. Booth**

The Pennsylvania Rules of Civil Procedure do not allow ex-parte communications with treating physicians: "Information may be obtained from the treating physician of a party only upon written consent of that party or through a method of discovery authorized by this chapter." (Pa. R. Civ. P. 4003.6) Zimmer narrowly construes this provision to avoid compliance while admitting that Dr. Booth has implanted the *NexGen* Knee Products in no less than five plaintiffs. *Zimmer Supplement* at 7. Zimmer's position is not supported by Pennsylvania case law.

"Rule 4003.6 is clear in its directive. Only upon consent or through a method of authorized discovery may information be obtained from a party's treating physician. These procedures protect both the patient and the physician by ensuring that adverse counsel will not abuse the opportunity to contact or interrogate the physician privately. When formal discovery is undertaken in the presence of a patient's counsel it can be assured that irrelevant medical testimony will not be elicited and confidences will not be breached, preserving the trust which exists between doctor and patient." *Marek v. Ketyer*, 1999 PA Super 116, 733 A.2d 1268, 1270 (Pa. Super. Ct. 1999)

The court in *Marek v. Ketyer* ordered a new trial based upon defendant's retention of a treating physician as an expert witness. The court was not concerned that the physician did not disclose any confidential information about the individual plaintiff as Zimmer suggests it will not do here. Hence, although *Marek v. Ketyer* does not involve multiple plaintiffs or an MDL setting, the case is indicative that a Pennsylvania court would deny Zimmer's request.

### C. Illinois' *Petrillo* Doctrine Bars *Ex Parte* Communications With Drs. Rosenberg and Berger

As more fully set forth in Plaintiffs' initial brief, the *Petrillo* doctrine bars Zimmer's request for ex-parte communications with any of Plaintiffs' treating doctors. "The fundamental holding that ex parte discussions between defense counsel and plaintiff's treating physician shall be conducted only through authorized methods of discovery has been overwhelmingly approved in subsequent Illinois Appellate Court cases." L. Bonaguro & M. Jochner, *The Petrillo Doctrine: A Review and Update,* 83 Ill. B.J. 16, 16 (1995). *Petrillo* and its progeny stand for a very simple concept that Illinois courts have supported without exception: A defendant's access to treating physicians is limited to formal discovery, period!

### D. In New Jersey and New York, Rule 1.7 of the Model Rules of Professional Conduct Prevents Zimmer's Attorneys from Representing Drs. Tria and Dr. Scuderi.

Plaintiffs' acknowledge that New Jersey and New York case law allows a defendant, subject to patient notification and consent pursuant to HIPAA, the right to engage in ex parte communications with a plaintiff's treating doctors. This rule, however, does not mean that plaintiffs must surrender their rights to full and fair discovery against that physician as a fact witness. Nor, does New Jersey or New York law suggest that the application of Rule 1.7 of the Model Rules of Professional Conduct would allow a defendant (and its attorneys) to engage in such communications where the treating doctor might potentially become an adverse party to Zimmer's interests in the lawsuit.

Here, one of Zimmer's stated defenses is doctor error.[17] In other words, Zimmer believes in many cases that the *cause* of the revision is the implanting surgeon's neglect. Conversely, a treating doctor may argue that the product was defective. The existence of these diametrically opposed positions places the relationship between Zimmer and all treating doctors squarely at odds. Even more disturbing are the ethical implications of Zimmer's counsel providing legal services for the treating doctors. Rule 1.7 of the Model Rules, which has been adopted by every state, dictate that such dual representation would be strictly prohibited as a non-waivable conflict of interest.[18]

---

[17] *See Zimmer Entities' Position Statement*, Doc. No. 209 at 8-9.

[18] **Rule 1.7 Conflict Of Interest: Current Clients** (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

**CONCLUSION**

On the surface, it would appear that Zimmer's concession to ask permission for limited contact with only six physicians might be reasonable. Presumably, that was Zimmer's intent – to appear reasonable. But Zimmer has carefully chosen the six surgeons who undoubtedly will be critical fact witnesses to this case and, who must be made available to the fact discovery process, without the shackles of being tagged as possessed by Zimmer as supposed "consulting experts." If this Court is going to permit Zimmer any reprieve at all, it should be done with strict restraints. It should allow Plaintiffs to conduct full discovery without claims of privilege. If Zimmer needs to consult on design issues going forward, there are parameters that may be set to protect forward-looking trade secrets. But discussions and communications in the past are discoverable and cannot be obscured by a claim of "consulting expert" request.

Plaintiffs request that Zimmer's motion be denied and the Court bar Defense counsel, as was done in *In re Kugel Mesh Hernia Repair Patch Litigation*, 2008 WL 4372809 (D.R.I. 2008), from engaging in ex parte communications with Plaintiffs treating physicians, for any purpose, including, but not limited to, negotiating with them to work as expert witnesses. If the Court grants Zimmer's motion as to any physician than Plaintiffs should be allowed compliance with subpoenaed document production by that physician and a complete fact witness deposition of that physician prior to any ex-parte contact by Defense counsel.

Dated: July 23, 2012

Respectfully submitted,

**FOOTE, MEYERS, MIELKE & FLOWERS, LLC**

/s/  Peter J. Flowers
Peter J. Flowers

- 13 -

Peter J. Flowers, Esq. (#06210847)
Foote, Meyers, Mielke & Flowers
3 North Second Street, Suite 300
St. Charles, Illinois 60174
Phone: (630) 232-6333
Fax: (630) 845-8982
Email: pjf@foote-meyers.com

*Plaintiffs' Co-Lead Counsel*

Tobias L. Millrood, Esq.
Eight Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428
Phone: (610) 941-4204
Fax: (610) 941-4245
Email: tmillrood@pbmattorneys.com

James R. Ronca, Esq.
Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.
1710 Spruce Street Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 875-7700
Email: jronca@anapolschwartz.com

Timothy J. Becker, Esq.
Johnson Becker PLLC
33 South Sixth Street, Suite 4530
Minneapolis, MN 55402
Phone: (612) 333-4662
Fax: (612) 339-8168
Email: tbecker@johnsonbecker.com

*Plaintiffs' Liaison Counsel*

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2012, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the Court.

/s/ Peter J. Flowers_____