# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ZIMMER NEXGEN KNEE | ) | |
| IMPLANT PRODUCTS LIABILITY | ) | **MDL No. 2272** |
| LITIGATION | ) | |
| | ) | **Master Docket No. 11 C 5468** |
| **This Document Relates to All Cases** | ) | |
| | ) | |
| | ) | **Hon. Rebecca R. Pallmeyer** |

## MEMORANDUM OPINION

Defendants Zimmer, Inc. and its affiliates ("Defendants" or "Zimmer") are manufacturers of the Zimmer NexGen knee implant devices that are the subject of this multidistrict litigation ("MDL"). In this motion, Defendants seek authority under certain conditions to contact prospective expert witnesses who also happen to be treating physicians for several Plaintiffs whose cases are consolidated in this MDL. As Defendants note, the size of this MDL is significant: it now comprises more than 530 individual actions, and Plaintiffs have suggested the number may rise to 1000. To date, Plaintiffs have identified 549 treating physicians, including at least a handful who are involved in the design of the implant devices at issue in this case. (Zimmer's Reply in Supp. of Its Mot. for an Order Concerning Zimmer's Contact With and Use of Treating Physicians as Defense Experts at 2 n.1.) If they are unable to contact any of these doctors, Defendants contend, their defense will be unfairly compromised.

Plaintiffs object to Defendants having any contact with treating physicians. Plaintiffs cite the law of several states, including Illinois, prohibiting *ex parte* communications between a defendant's counsel and a plaintiff's treating physician. Under these "*ex parte* rules," confidential information for which a plaintiff has waived the physician-patient privilege is available to the defendants only via formal methods of discovery. *See, e.g.*, *Petrillo v. Syntex Labs., Inc.*, 148 Ill. App. 3d 581, 499 N.E.2d 952 (1st Dist. 1986). Anticipating this objections, Defendants have drafted a Proposed Order to address the public policy concerns that motivate some states to implement blanket

prohibitions against such communications. As ordered by MDL transferee courts in some other MDL cases, Defendants propose that their contact with Plaintiffs' treating physicians should be permitted, subject to an order limiting contact with prospective expert witnesses who are also treating physicians of individual plaintiffs as follows:

1. Zimmer's counsel will not communicate with physician-expert about any of his or her patients who are plaintiffs in this MDL.
2. Zimmer and its counsel may not use a physician as a consulting or testifying expert in a case where that physician's present or former patient is a plaintiff in that particular case.
3. Before having any substantive communication with a prospective physician-expert, Zimmer's counsel will provide the treating physician with this Order and will secure the treating physician's written acknowledgment that he or she has read the attached Memorandum to Physicians, except that [an] expert[ ] retained as of the date of this Order shall be provided with this Order within thirty (30) days, and shall provide written acknowledgment that he or she has read the attached Memorandum to Physicians.

(Defs.' Proposed Order Concerning Contact with Physicians.)

Following a June 21 hearing, Defendants filed a supplement to their motion, asking the court to stay its decision on Zimmer's contact with treating physicians in general in order to first address Zimmer's request for leave to contact six physicians Defendants believe are crucial to preparation of their defense. These six physicians, Zimmer explains, are surgeons with whom Zimmer contracted to assist in the development of the medical devices at issue in this case. (Supp. to Zimmer's Mot. for an Order Concerning Zimmer's Contact with Treating Physicians—Zimmer's Design Surgeons at 1-2.)[1] They are also the treating physicians for one or more individual Plaintiffs whose cases are consolidated in this MDL.

For the reasons explained below, the court grants Defendants' motion to permit contact with the six named physicians. Further, the court sees no reason for additional briefing on the larger issue of Defendants' contact with other treating physicians. The court grants Defendants' motion

---

[1] The six physicians practice in New Jersey (Dr. Alfred Tria), New York (Dr. Giles Scuderi), Pennsylvania (Dr. Robert Booth), Utah (Dr. Aaron Hoffman), and Illinois (Drs. Aaron Rosenberg and Richard Berger). (*Id.* at 4-9.)

to allow contact with other treating physicians, as well, subject to the additional limitation, proposed by Defendants' counsel at oral argument, that Defendants contact no more than twenty-five prospective expert witnesses who are also treating physicians of Plaintiffs whose cases are consolidated in this MDL.

## I.    Choice of Law

The court begins with the question of what law governs the matter of Defendants' contact with Plaintiffs' treating physicians. In its initial memorandum in support of its Motion for an Order Concerning Contact With Physicians, Defendants assert that federal procedural law governs a party's contact with witnesses. Plaintiffs respond that the court should apply Illinois law to this question. Defendants' reply maintains that if Plaintiffs are correct that state law governs, then this court must apply the forum state law for each of the 500+ consolidated cases, using different rules for different sets of Plaintiffs.

Federal courts have not reached a consensus on this issue. Plaintiffs' suggestion that the court apply Illinois law to all cases in this MDL has arguably the least support. At least one federal court did apply the choice-of-law rules of the state in which the transferee court sits to all cases in that MDL. *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1078 (S.D. Ind. 2001). That court concluded that Indiana's choice-of-law rules applied because the plaintiffs had filed a master complaint in that forum, and the parties agreed that the court should be treated as the forum court. *Id.* In the absence of such consent, however, most MDL courts "treat consolidated complaints filed in multi-district litigation as a procedural device rather than a substantive pleading with the power to alter the choice of law rules applicable to the plaintiff's claims." *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 56 (D.N.J. 2009) (collecting cases).[2]

---

[2]    Of course, even if Illinois's choice-of-law rules applied to all cases, it is not clear that
(continued...)

The majority of courts that have addressed the issue of *ex parte* communications with a plaintiff's treating physician assume or conclude that federal courts must apply state *ex parte* rules under Federal Rule of Evidence 501. *See, e.g.*, *In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-MD-1760, 2008 WL 8576167, at *1 (M.D. Tenn. Jan. 17, 2008); *Benally v. United States*, 216 F.R.D. 478, 480 (D. Ariz. 2003); *McCauley v. Purdue Pharma, L.P.*, 224 F. Supp. 2d 1066, 1068-69 (W.D. Va. 2002); *Neubeck v. Lundquist*, 186 F.R.D. 249, 250-51 (D. Me. 1999); *Doe v. City of Chicago*, No. 96 C 5739, 1998 WL 386352, at *2 (N.D. Ill. July 7, 1998); *Horner v. Rowan Cos.*, 153 F.R.D. 597, 601 (S.D. Tex. 1994); *Gobuty v. Kavanagh*, 141 F.R.D. 136, 138 (D. Minn. 1992). Rule 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." FED. R. EVID. 501. One MDL transferee court granted the defendant permission to initiate *ex parte* communications with the plaintiffs' treating physicians, but interpreted Rule 501 to confine those communications to those physicians located in states without

---

[2](...continued)
those rules would, in each case, call for the application of Illinois's rule against *ex parte* communications with treating physicians. Generally, Illinois courts follow the Restatement (Second) of Conflict of Laws in resolving choice-of-law issues. *See Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 193 Ill. 2d 560, 568, 739 N.E.2d 1263, 1269 (2000). The Restatement provides, in relevant part, "[e]vidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139. Though the Illinois Supreme Court has not addressed the issue, several Illinois appellate courts have adopted section 139 of the Restatement. *See People v. Allen*, 336 Ill. App. 3d 457, 459, 784 N.E.2d 393, 394 (2d Dist. 2003); *Sterling Fin. Mgmt., L.P. v. UBS PaineWebber, Inc.*, 336 Ill. App. 3d 442, 453, 782 N.E.2d 895, 903-04 (1st Dist. 2002).

Except for those cases that originated in Illinois transferor courts, most of the cases in this MDL have little or no relationship with Illinois. Consequently, if the rule against *ex parte* communications is interpreted as a law of privilege, it is not clear that the rule would apply where the law of the state with the most significant relationship in a particular case does not similarly prohibit *ex parte* communications between a defendant and a plaintiff's treating physician.

statutes or court decisions expressly prohibiting such communications. *See In re Aredia & Zometa Prods. Liab. Litig.*, 2008 WL 8576167, at *1-2.[3]

Several courts have reached the opposite conclusion, however, holding that while state law may govern privilege, federal procedural law still governs discovery practice. *See, e.g.*, *Patton v. Navartis Consumer Health, Inc.*, No. 4:02-CV-0047-DFH-WGH, 2005 WL 1799509, at *2 (S.D. Ind. July 25, 2005); *Shots v. CSX Transp., Inc.*, 887 F. Supp. 206, 207-08 (S.D. Ind. 1995); *Lake v. Steeves*, 161 F.R.D. 441, 441-42 (D. Kan. 1994); *Evertson v. Dalkon Shield Claimants Trust*, Nos. 82-1021-MLB, 85-1644-MLB, 92-1409-MLB, 92-1417-MLB, 1993 WL 245972, at *1 (D. Kan. June 2, 1993); *Filz v. Mayo Found.*, 136 F.R.D. 165, 175 (D. Minn. 1991); *cf. In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. 473, 475, 477 (E.D. La. 2005) (applying its own bar against *ex parte* communications regarding the plaintiffs' medical history to cases from all fifty states, but noting that the issue was a "discovery issue and not a substantive one").[4] These courts recognize that a state's law of privilege applies in diversity actions, but they conclude that a plaintiff waives the physician-patient privilege as to all matters relevant to the case by putting his or her medical condition at issue. Thus, state law banning *ex parte* communications between defense counsel and a plaintiff's treating physician merely governs the method of discovery, not the operation of the

---

[3]    The court concluded that Alabama, California, Georgia, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Dakota, Ohio, Oklahoma, South Carolina, Texas, and Wisconsin either did not recognize the physician-patient privilege or did not have any clear court decisions or statutes barring *ex parte* communications between plaintiffs' physicians and defense counsel. *Id.* at *3. In contrast, the court found the law of Arizona, Arkansas, Illinois, Indiana, Iowa, Minnesota, Mississippi, North Carolina, Pennsylvania, Rhode Island, Tennessee, and Washington clearly prohibited *ex parte* communications, and excluded physicians located in those states from its order. *Id.* at *2.

[4]    Plaintiffs cited *Vioxx* for the proposition that this court should apply Illinois state law, but the *Vioxx* court did not cite any state law to support its order. Instead, it treated the issue as one concerning federal discovery practice, and cited general and historical sources regarding the physician-patient privilege not specific to any state. Although the court ultimately decided to prohibit defendants from contacting a plaintiff's treating physician, *Vioxx* is distinguishable from this case because the *Vioxx* defendants wanted to speak with the plaintiff's physicians for the purposes of obtaining the plaintiffs' medical information. *Id.* at 475-76.

privilege. *See Shots*, 887 F. Supp. at 207 (concluding that Indiana's ban on *ex parte* communications "governs Indiana discovery procedure, but does not change the essential elements of the physician-patient privilege"); *Evertson*, 1993 WL 245972, at *1 ("The *method* for discovering unprivileged material—whether by written interrogatories, requests for admissions, deposition, or *ex parte* interviews—is entirely a matter of procedure governed by the Federal Rules of Civil Procedure."); *Filz*, 136 F.R.D. at 172 (siding with those courts that "have characterized ex parte interviews as a method of informal discovery rather than a conditional waiver of the physician-patient privilege").

These courts further conclude that while the Federal Rules of Civil Procedure do not explicitly provide for such informal discovery methods, the district court has discretion to allow such informal communications under federal procedural law. *See Patton*, 2005 WL 1799509, at *3 (citing *Hickman v. Taylor*, 329 U.S. 495 (1947) for the proposition that the right to conduct *ex parte* witness interviews "is taken for granted as a matter of federal procedure"); *Shots*, 887 F. Supp. at 207 ("Under the federal rules, district court judges are given wide discretion to supervise the discovery process, and their decisions are subject to review only for abuse of discretion.").

This court recognizes merit in the minority position. Broadly speaking, the law of privilege addresses which relationships and communications are privileged, who may assert the privilege, and how the privilege is waived. *See* McCormick on Evidence §§ 98-105 (6th ed. 2006). A state ban on *ex parte* communications between the defendant and a plaintiff's treating physician does not fit squarely within this privilege analysis. Indeed, such a ban would presumably apply even in circumstances (arguably present here) where plaintiff has waived the physician-patient privilege by putting his or her medical condition at issue.

The *ex parte* rule shares certain public policy goals with the law of privilege, but the rule operates by imposing restrictions on the methods of discovery—traditionally a matter within the broad discretion of the district court. The Federal Rules of Civil Procedure do not directly address

6

the matter of *ex parte* contacts at issue in this case, but those rules do empower the court to "regulate practice in any manner consistent with federal law, rules adopted under 29 U.S.C. §§ 2072 and 2075, and the district's local rules." FED. R. CIV. P. 83(b). Circumstances like this, where no Federal Rules directly address the issue, call upon the court to "follow the Rules of Decision Act, 28 U.S.C. § 1652, and make the 'relatively unguided *Erie* choice,'" to determine whether the state law prohibiting *ex parte* communications is a "rule of decision" that federal courts are obliged to apply. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1448 (2010) (Stevens, J., concurring in part and concurring in the judgment) (quoting *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)). The court considers whether application of state law would be "outcome-determinative" in light of the "twin aims of the *Erie* rule: discouragement of forum shopping and avoidance of inequitable administration of the laws." *Hanna*, 380 U.S. at 468; *see also Houben v. Telular Corp.*, 309 F.3d 1028, 1034 (7th Cir. 2002).

The ruling at issue cannot be understood as "outcome determinative." The ruling Defendants seek would permit defense counsel to initiate *ex parte* communications with prospective expert witnesses who happen to be treating physicians of a very small subset of Plaintiffs in this MDL. Such a ruling would govern discovery practice—thus, it "concerns merely the manner and the means by which a right to recover, as recognized by the State, is enforced," as opposed to a "matter of substance" that would "significantly affect the result of a litigation." *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 107 (1945).

Nor is the court concerned that failure to apply a state's prohibition on *ex parte* communications in the MDL context would lead to forum shopping. Defendants' Proposed Order bars defense counsel from speaking with a prospective expert witness about any Plaintiff's case for whom that witness was the treating physician; the order also prohibits that witness from testifying as an expert in any of his/her own patients' cases. The Proposed Order therefore offers Defendants no tactical advantage that they would not have if these cases were tried individually in

states that recognize the bar on *ex parte* communications. Put another way, Plaintiffs have not shown that, were these cases heard individually in state courts, the *ex parte* rule would preclude Defendants from speaking with a prospective expert witness for a case to which the witness had no connection, simply because that witness was a treating physician in a separate case.

Finally, the court notes a concern that application of those states' laws that prohibit *ex parte* communications would be inequitable in the MDL context. It is safe to say that those state courts and/or legislatures did not have nationwide MDLs in mind when drafting their bans on *ex parte* communications. In a nationwide MDL having well more than 500 plaintiffs (and potentially as many as 1000), prohibiting Defendants from initiating *ex parte* communications with any physician who treated any Plaintiff has the practical effect of limiting the pool of prospective expert witnesses even though, had these cases been tried separately, Defendants could have engaged an expert witness in any case in which that witness was not the treating physician. There is, thus, a sense in which application of the *ex parte* prohibition would create an unfair advantage for Plaintiffs that would not be present if these cases were heard individually. *See In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2008 WL 821889, at *3 (M.D. Fla. Mar. 21, 2008)("Plaintiffs' counsel should not be allowed to keep the leading physician-experts from testifying for the defendant in every Plaintiffs' case simply because, through advertising, they solicited a large number of clients and aggregated all of their cases in one forum" (internal quotation marks omitted)).

Moreover, the prohibition Plaintiffs seek is arguably impracticable: if Defendants were to select and interview a prospective expert witness who has not treated any of the Plaintiffs currently part of this litigation, it is entirely possible that the case of one of that physician's patients may be consolidated into this MDL in the future. Any interpretation of the *ex parte* rule that would permit Plaintiffs to eliminate potential expert witnesses one by one obviously threatens the efficiency of discovery practice—efficiency that was the central purpose for consolidating these cases into an MDL in the first place. *See* 28 U.S.C. § 1407(a) (authorizing MDL litigation "for the convenience

8

of parties and witnesses" and to "promote the just and efficient conduct of such actions"); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1997 WL 109595, at *2 (E.D. Pa. Mar. 7, 1997) (citing Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, 72 F.R.D. 211, 211-13 (1976)) ("[T]he primary purpose behind the establishment of a multidistrict litigation transferee court was and is to promote efficiency through the coordination of discovery.").

## II.     Appropriateness of the Proposed Order

As more fully explained below, the court concludes that Defendants' Proposed Order, which contains limits to safeguard confidential information, is appropriate as a matter of federal procedural law, and is not precluded by the law of those states where the six prospective witnesses identified by Defendants practice.

### A.     Similar MDL Orders

Subject to the safeguards proposed here, other MDL transferee courts have issued orders allowing defendants to consult with and retain expert witnesses who have treated individual plaintiffs. *See Seroquel*, 2008 WL 821889, at *4; *In re Prempro Prods. Liab. Litig.*, No. 4:03CV1507WRW (E.D. Ark. Dec. 7, 2005).[5] *But see In re Kugel Mesh Hernia Repair Patch Litig.*, MDL No. 07-1842ML, 2008 WL 4372809, at *2 (D.R.I. Sept. 19, 2008) (rejecting a similar motion where the defendant, in a parallel state court proceeding, disclosed only one expert witness who was also a treating physician).  For example, in *In re Seroquel Products Liability Litigation*, which consolidated products liability cases against AstraZeneca, the manufacturer of an allegedly defective antipsychotic drug, the court entered an order allowing AstraZeneca to communicate with

---

[5]     At least two state MDL courts have approved similar orders.  *See In re Pelvic Mesh/Gynecare Litig.*, 426 N.J. Super. 167, 195, 43 A.3d 1211, 1227 (N.J. Super. Ct. App. Div. 2012) (reversing a trial court's order barring defendants from consulting with or retaining experts who were treating physicians); *In re Minn. Penile Prosthesis Litig.*, No. PI 97-1183 (Minn. Dist. Ct. May 11, 1998) (granting an order allowing defendants to retain expert urologists who may have treated individual plaintiffs, provided that the urologists continue to protect confidential communications regarding their patient's medical conditions).

prospective physician-experts who practiced in Florida, provided that the communication not concern any of the Florida patients involved in the litigation; that the expert not testify in any case in which his present or former patients were the plaintiff; and that AstraZeneca provide the physician a copy of the order and obtain written acknowledgement that the physician had read it before having any substantive communications.  2008 WL 821889, at *4.

In entering that order, the court acknowledged a Florida statute that barred *ex parte* communications between third-party defendants and treating physicians; the statute specifically limited defendants to discovery by "subpoena at a deposition, evidentiary hearing, or trial for which proper notice has been given."  FLA. STAT. § 456.057(8).  The court nevertheless agreed with AstraZeneca that the Florida statute did not preclude it "from contacting a physician and retaining that physician as a defense expert in any case involving other Plaintiffs that the physician has never seen as patients."  *In re Seroquel*, 2008 WL 821889, at *2.  To bar all such contact, the court reasoned, would infringe on AstraZeneca's right "to search for and hire local physicians to serve as viable testifying expert witnesses."  *Id.* at *3.  The court noted that because the plaintiffs had identified more than 3100 treating physicians, an order barring all contact between AstraZeneca and these physicians would "limit[ ] the local pool of physicians available to serve as experts significantly."  *Id.*  The court was satisfied that the limits proposed in AstraZeneca's order would safeguard any patient-specific information protected under Florida law.  *Id.* at *3-4.

Plaintiffs here assert that before making the proposed *ex parte* contacts, Defendants must be required first to establish that "there are no qualified experts otherwise available."  (Pls.' Mem. Opposing Zimmer's Attempt to Engage Pls' Treating Physicians as Experts (hereinafter "Pls.' Mem."), at 12.)  The court believes that standard is too high.  For one thing, any such showing would potentially reveal defense counsel's criteria for selecting prospective expert witnesses and, thus, disclose attorney work product.  *Cf.* FED. R. CIV. P. 26(b)(3) (directing courts to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's

attorney or other representative concerning the litigation"); *Hickman v. Taylor*, 329 U.S. 395, 393 (1947) (recognizing that information gathered during informal interviews with witnesses is attorney work product); *Filz*, 136 F.R.D. at 169 n.7 (applying *Hickman* in the context of a defendant's *ex parte* communications with a plaintiff's treating physicians).

Moreover, as Defendants urge, preparation of the defense could be jeopardized if Defendants are limited in consulting even those physicians who, prior to being any Plaintiff's treating physician, contracted with Zimmer to help design the devices in question in this lawsuit. As it is now limited, Defendants' motion seeks leave for its lawyers to contact just six physicians who have treated Plaintiffs in the cases in this MDL and who are among the relatively small group of experts who are also Zimmer's "design surgeons." At oral argument, Defendants' counsel observed that any potential expert medical witness will likely have "implanted hundreds of knee replacement devices" and be a member of professional societies dedicated to total knee replacement—membership for which, Defendants represented, may be as low as 250 physicians. (June 21, 2012 Tr. at 110, 123).[6] The court concludes that Defendants will be unfairly limited if the court were to exclude from the potential pool of experts all of the physicians who have treated the 500+ Plaintiffs whose cases have already been consolidated into this MDL.

## B.    Public Policy

Plaintiffs make several public policy arguments in favor of prohibiting Defendants from communicating with all treating physicians, but the court concludes that the safeguards in the Proposed Order satisfactorily address these policy concerns. First, Plaintiffs note the concern that generally underlies the ban on *ex parte* communications between defendants and a plaintiff's treating physician: such communications are "potentially harmful to the interests of the patient in

---

[6]    Plaintiffs suggested that the number of available physician-experts is as high as 25,000, but that figure is for the total number of orthopedic surgeons in the country, not the number who specialize in total knee replacement. (June 21, 2012 Tr. at 115.)

that the physician might disclose intimate facts of the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit." *Petrillo*, 148 Ill. App. 3d at 595, 499 N.E.2d at 962. The order Defendants have proposed addresses this concern, however: it prohibits discussion of the medical treatment of any Plaintiff for whom the expert was or is a treating physician, and requires Defendants to make prospective experts aware of those constraints. Because the order explicitly prohibits any discussion of the individual Plaintiff's treatment—even where the Plaintiff has waived the privilege as to matters relevant to this litigation—there is less risk that physicians will reveal patient confidences that are unrelated or irrelevant to this lawsuit than in cases where the defendant wishes to speak with treating physicians specifically to discuss a plaintiff's medical condition.

Second, Plaintiffs urge that allowing Defendants to consult and retain Plaintiffs' treating physicians creates the risk that Defendants will improperly influence the testimony of physicians who may serve as fact witnesses in their own patients' cases. In *Doe v. Eli Lilly & Co.*, a court addressed a similar argument and observed:

> As a general proposition . . . no party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict any opponent's access to a witness, however partial or important to him, by insisting on some notion of allegiance. . . . Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows . . . . [W]hile the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the *ex parte* interview of a witness who is willing to speak.

99 F.R.D. 126, 128 (D.D.C. 1983); *accord Patton*, 2005 WL 1799509, at *4; *Filz*, 136 F.R.D. at 172. The court noted that the potential for influencing trial testimony "is inherent in every contact between a prospective witness and an interlocutor, formal or informal, and what a litigant may justifiably fear is an attempt by an adversary at *improper* influence for which there are sanctions enough if it occurs." *Doe*, 99 F.R.D. at 128. Furthermore, the fear of improper influence cuts in

both directions.  As another district court recognized, it would be inequitable to issue an order that "allows one side unfettered and unsupervised access to important witnesses, yet prohibits such contact for the other side." *Patton*, 2005 WL 1799509, at *5.  Plaintiffs have given this court no reason to suspect that Defendants will use the opportunity to screen prospective physician-experts as an avenue for improper influence over those physicians, but should this occur, the court is willing to order appropriate remedies.

Third, Plaintiffs suggest that consulting and retaining treating physicians would constitute a conflict of interest for Zimmer's own attorneys under Rule 1.7 of the Model Rules of Professional Conduct.  Under this analysis, the fact that Zimmer has identified implanting surgeon error as one of its defenses creates a direct conflict between Zimmer and all treating physicians.  Plaintiffs also note that Zimmer's interests diverge from those of (1) Dr. Berger, whose rocky relationship with Zimmer and concerns about the products at issue in this case were featured in a 2010 *New York Times* article, *see* Barry Meier, *Surgeon vs. Knee Maker: Who's Rejecting Whom?*, N.Y. Times, June 20, 2010, at BU1, and (2) Dr. Scuderi, who has sued Zimmer for allegedly unpaid royalties and denial of inventorship credit for three of Zimmer's knee patents, *Scott v. Zimmer Inc.*, No. 10-772-GMS (D. Del. Sept. 10, 2010).  According to Plaintiffs, Zimmer's counsel would violate Model Rule 1.7 by communicating with and "providing legal services for the treating doctor" given that "the treating doctor might potentially become an adverse party to Zimmer's interests in the lawsuit." (Pls.' Further Resp. Opposing Zimmer's Mot. Concerning Contact With Treating Physicians at 12.) But Plaintiffs cite no source to support its arguments that the conflict of interests rules that govern a lawyer's relationship with his or her clients and prospective clients also applies to expert witnesses.

Finally, Plaintiffs maintain that allowing a Plaintiff's treating physician to serve as an expert witness would violate that physician's fiduciary obligations to the patient, which, according to Plaintiffs, includes a duty of assistance in litigation.  The only case Plaintiffs cite in support of this

13

contention, however, is an unpublished decision by the New Jersey Superior Court in a state MDL, *In re Accutane*, No. 271 (N.J. Super. Ct. July 1, 2010). Quoting a New Jersey Supreme Court cases, which in turn quotes a Pennsylvania trial court decision, the *Accutane* court concluded that

> "[m]embers of the medical profession 'owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation."

*Id.* slip op. at 12 (quoting *Stempler v. Speidell*, 100 N.J. 368, 381, 495 A.2d 857, 864 (1985) (quoting *Alexander v. Knight*, 197 Pa. Super. 79, 177 A.2d 142 (Pa. Super. Ct. 1962))). Consequently, the court denied the defendant pharmaceutical company's motion to allow *ex parte* communications with plaintiff-patients' treating physicians. *Id.* slip. op. at 13.

More recently, however, a New Jersey appellate court held that a medical device manufacturer is free to interview the plaintiffs' treating physicians as prospective expert witnesses in a state MDL. *See In re Pelvic Mesh/Gynecare Litig.*, 426 N.J. Super. at 195, 43 A.3d at 1227. The court noted that *Stempler* merely made reference to the older Pennsylvania trial court decision that identified a duty to aid a patient's litigation position; it did not adopt the Pennsylvania court's interpretation of a physician's fiduciary duty as the law of New Jersey. *Id.* at 186, 43 A.3d at 1222.[7] Indeed, the New Jersey Supreme Court implicitly rejected the duty of affirmative assistance in litigation, holding in *Stempler* that defense counsel are free to informally interview treating physicians. *Stempler*, 100 N.J. at 382, 495 A.2d at 864.

---

[7] Even in Pennsylvania, courts are not in agreement over the fiduciary duty described in *Alexander v. Knight*. *Compare Moses v. McWilliams*, 379 Pa. Super. 150, 169, 549 A.2d 950, 960 (Pa. Super. 1988) (rejecting a cause of action for breach of confidentiality brought against a doctor who had *ex parte* pretrial discussions with medical malpractice defendant's attorney and testified at trial as an expert witness); *with Haddad v. Gopal*, 787 A.2d 975, 980-81 (Pa. Super. 2001) (recognizing a cause of action for breach of confidentiality where the disclosure was unrelated to any judicial proceeding).

Likewise, the *Pelvic Mesh* court declined to "impose a duty of loyalty upon a physician not to disagree with the patient's litigation position. Rather, as imposed by law, the physician's duties in litigation are to cooperate procedurally when called upon and to provide truthful information." *In re Pelvic Mesh/Gynecare Litig.*, 426 N.J. Super. at 188, 43 A.3d at 1223. The court concluded that "[c]ourts overstep their legitimate powers if they impose a duty of silence upon physicians to avoid taking substantive positions contrary to any patient's interests in litigation." *Id.* at 195, 42 A.3d at 1227. Addressing a physician's ethical duties under the Code of Medical Ethics of the American Medical Association, the court noted that "[t]he Code does not require that physicians avoid taking an adverse position to their patients' 'litigation interests' but that they avoid adverse effects upon their patients' 'medical interests.'" *Id.* at 189, 43 A.3d at 1224 (citing Code of Medical Ethics, Opinion 9.07 (Am. Med. Assoc. 2010-2011 ed.)). The court acknowledged that a patient's "medical interests" may be consistent with the patient's "litigation interests," but concluded that whether there is a conflict should be determined "as a matter of professional judgment by the treating physician, not by the patient's lawyers, or by the courts applying wholesale rules of prohibition and disqualification." *Id.*

The *Pelvic Mesh* court reversed the trial court's order prohibiting defendants from using a plaintiff's treating physician as an expert witness in other consolidated cases, observing that both parties should be free to choose expert witnesses from the best qualified doctors. *Id.* at 195, 43 A.3d at 1227. "The fact that [a multidistrict proceeding] involves coordinated case management does not justify a broad finding of presumed prejudice to plaintiffs and the blanket disqualification of qualified physicians from providing assistance and testimony for the defense." *Id.* at 192, 43 A.3d at 1225.

This court is persuaded by the *Pelvic Mesh* court's reasoning. Defendants' Proposed Order safeguards the physician-patient relationship by precluding treating physicians from testifying as expert witnesses for the defense in the trials of their own patients. The patient's interest in the

physician-patient relationship does not require a blanket prohibition against any treating physician serving as an expert witness for the defense in cases brought by other Plaintiffs.

## C. State Law

Finally, the court concludes that Defendants' Proposed Order, allowing *ex parte* communications subject to certain safeguards, is not inconsistent with the law of the five states where the six prospective witnesses identified by Defendants practice: New Jersey, New York, Pennsylvania, Utah, and Illinois. As noted above, a New Jersey appellate court reversed a trial court for denying a similar order in a state MDL proceeding. *See Pelvic Mesh*, 426 N.J. Super. at 195, 43 A.3d at 1227. Similarly, the New York Court of Appeals has held that where a patient has affirmatively placed his or her medical condition in controversy, a court may compel the patient to execute Health Insurance Portability and Accountability Act (HIPAA) authorizations so that defendant's counsel can initiate *ex parte* interviews with the patient's treating physician. *See Arons v. Jutkowitz*, 9 N.Y.3d 393, 401-02, 8500 N.E.2d 831, 832-33 (2007).[8] Consequently, Defendants' Proposed Order, which prohibits discussion of the medical conditions of a treating physician's patients, limits *ex parte* discussions more than is required under New Jersey and New York law.

In contrast, the Pennsylvania Supreme Court does limit informal discovery involving a plaintiff's treating physician through Rule 4003.6 of Pennsylvania's Rules of Civil Procedure. That rule provides:

> Information may be obtained from the treating physician of a party only upon written consent of that party or through a method of discovery authorized by this chapter. This rule shall not prevent an attorney from obtaining information from:
> (1) the attorney's client,
> (2) an employee of the attorney's client, or
> (3) an ostensible employee of the attorney's client.

---

[8]     The HIPAA requirements noted in *Arons* are not at issue in this case because Defendants do not seek to obtain any confidential patient information protected by HIPAA through *ex parte* communications with prospective expert witnesses, and the Proposed Order prohibits release of any such patient-specific information.

16

PA. R. CIV. P. 4003.6. The court is unsure about the intended scope of the "ostensible employee" exception, but it appears broad enough to incorporate Dr. Booth, a Pennsylvania-based doctor whom Zimmer hired as a consulting physician in the design of the devices at issue in this case.

Outside of formal discovery, communications between treating physicians and defense counsel concerning a plaintiff-patient's medical treatment are prohibited by court decisions in both Utah and Illinois. *See Sorensen v. Barbuto*, 177 P.3d 614 (Utah 2008); *Best v. Taylor Machine Work*, 179 Ill. 2d 367, 689 N.E.2d 1057 (1997). But even where such a prohibition is codified by a state's legislature, at least one federal court has held that such laws do not preclude a defendant from contacting and retaining a physician "as a defense expert in any case involving other Plaintiffs that the physician has never seen as patients." *Seroquel*, 2008 WL 821889, at *2 (addressing FLA. STAT. § 456.057(7)(a)). Likewise, the present case is distinguishable from *Sorensen* and *Petrillo* because the information Defendants seek to obtain is not the particular diagnosis or treatment of a patient, but rather the physician's "overall knowledge regarding the nature, use, risks, and safety of defendants' . . . products and the conditions that patients may experience as a result of their use." *Pelvic Mesh*, 426 N.J. Super. at 185, 43 A.3d at 1221. Because the highest courts in Utah and Illinois have not addressed the question of whether the prohibition against *ex parte* communications extends beyond an individual patient's case to other cases consolidated with that case for the purposes of pretrial case management, the court's "'task is to ascertain the substantive content of state law . . . as it would be [determined] by that court if the present case were before it now." *Thomas v. H & R Block E. Enters., Inc.*, 630 F.3d 659, 663 (7th Cir. 2011) (quoting *Woidtke v. St. Clair Cnty.*, 335 F.3d 558, 562 (7th Cir. 2003)).

In this case, enforcing a ban on *ex parte* communications between physicians of one patient would exclude some of the most qualified experts—"design physicians" who had a business relationship with Zimmer prior to implanting knees in any of the Plaintiffs—from consulting with or testifying as expert witnesses for the defense in the case of any other Plaintiff. Defendants have

17

represented that they expect any physician qualified to testify as an expert to have conducted hundreds of knee replacement surgeries; as a result, the chance that a prospective expert witness is treating or has treated a Plaintiff in this case increases with the level of the physician's experience. Enforcement of such a ban would give Plaintiffs a tactical advantage that they would not possess if the cases were not consolidated. The court concludes that in such circumstances, Utah and Illinois courts would adopt an approach similar to that used by the New Jersey *Pelvic Mesh* court and by the MDL courts that have granted motions similar to Defendants' Proposed Order, subject to the safeguards Defendants have proposed.[9]

### D.    Scope of the Proposed Order

As noted, the relief Defendants are requesting at this stage is somewhat limited: as modified, Defendants' motion seeks an order authorizing it to initiate *ex parte* communications with six physicians who practice in New Jersey, New York, Pennsylvania, Utah, and Illinois. Defendants ask the court to continue its stay on Defendants' motion with respect to other prospective expert witnesses, which Defendants will address in a separate motion. The current motion has been subject to two full rounds of briefing, however, and the court does not believe that a third round would add anything to the arguments the parties have already made.

---

[9]    Allowing such leeway in discovery practice appears particularly apt under Illinois law. In *Best v. Taylor Machine Works*, the Illinois Supreme Court struck down 735 ILCS 5/2-1003, which established a discovery mechanism allowing for *ex parte* communications between defendants and a plaintiff's treating physician in the wake of *Petrillo*. 179 Ill. 2d at 433-59, 689 N.E.2d at 1089-100. In concluding that the statute violated the Illinois Constitution, the court primarily resolved the issue on separation of powers grounds. *Best*, 179 Ill.2d at 438, 689 N.E.2d at 1091. The court held that a statute requiring courts to enter orders directing plaintiffs to consent to such *ex parte* communications created an "irreconcilable conflict with the inherent authority of the judiciary" by "impermissibly interfer[ing] with the inherently judicial authority to manage the orderly discovery of information relevant to specific cases." *Id.* at 439, 444, 689 N.E.2d at 1092, 1094. Although the *Best* court adopted the *Petrillo* doctrine and the public policy rationale for prohibiting *ex parte* communications, *id.* at 458-59, 689 N.E.2d at 1100, the court's acknowledgment of the need for case-specific discovery management appears to serve as a basis for recognizing an exception in unique circumstances, as are present for a court managing discovery in a nationwide MDL.

At this stage, the court sees no reason why Defendants' motion should not be granted with regards to all prospective expert witnesses. Plaintiffs have brought no state law to the attention of this court that would preclude defendants from retaining an expert witness in one case who happened to be a treating physician of a plaintiff in a separate case. The only state court decision prohibiting such contact in a consolidated case appears to be a Rhode Island decision referenced in *In re Kugel Mesh Hernia Patch Litigation*, 2008 WL 4372809, at *2. In that Rhode Island federal court decision, the court cited a Rhode Island Superior Court decision in a parallel proceeding that rejected the defendant's argument that the pool of available witnesses would be significantly depleted if defendant could not communicate with any of the plaintiffs' treating physicians. *Id.* As Rhode Island is located in a region of the country with a high concentration of physicians to draw from, that state court was skeptical about the effect of prohibiting such communications on Defendants' pool of expert witnesses. *See id.* (noting that when ordered by the state court "to disclose consulting experts who are also treating physicians, Defendants only identified one such doctor"). In contrast, this case is a nationwide MDL consolidating more than 500 cases (and potentially as many as 1000) where the most qualified experts are also the most likely to have treated a Plaintiff. Even among the relatively smaller pool of design surgeons, Plaintiffs have identified six physicians who have treated one or more Plaintiffs. The court does not believe that Defendants should be forced to resort to consulting with and retaining only foreign experts to prepare its Defense.

The court is mindful, however, "of the potential for misuse of this authorization, the danger of inappropriate communications and the possibility of conflicts and complexities as the cases develop and the varying roles of physicians intertwine." *Seroquel*, 2008 WL 821889, at *4. Though the court declines to prohibit Defendants from utilizing any particular treating physician as an expert witness in cases other than those brought by that physician's patients, the court does not think it would be appropriate for Defendants to contact all 549 treating physicians currently identified in this

19

case under the auspices of seeking out expert witnesses. Consequently, the court will grant Defendants' Proposed Order subject to the additional restriction, proposed by Defendants' counsel at oral argument on this issue (June 21, 2012 Tr. at 117), that Defendants contact no more than twenty-five physicians who are also any Plaintiff's treating physician. The twenty-five will include any of the six physicians specifically named in Defendants' motion, but exclude any physicians who are not and were not treating physicians for any Plaintiffs currently part of this MDL and whom Defendants contacted prior to the entry of this Memorandum Opinion and Order, but whose patients' cases may later be consolidated into this MDL.

Finally, the court pauses to note that entry of Defendants' Proposed Order is not certain to result in any large-scale communication between Defendants and Plaintiffs' treating physicians. No doctor is compelled to engage in *ex parte* communications with Defendants. *See Patton*, 2005 WL 1799509, at *5 ("The physicians are not required to agree to such interview. If they do agree, they are free to draw any boundaries they wish in terms of time, place, and subject matter."); *Doe*, 99 F.R.D. at 128 (noting that a physician willing to speak may impose appropriate conditions on their expert testimony, including "compensation for his time and expertise or payment of reasonable expenses involved"). By the same token, however, Plaintiffs are not free "to threaten physicians by suggesting that they would violate the law by talking with defense counsel." *Patton*, 2005 WL 1799509, at *5; *see also Pelvic Mesh*, 426 N.J. Super. at 194, 43 A.3d at 1227. The court expects that here, as in *Pelvic Mesh*, Plaintiffs' attorneys and Plaintiffs themselves will refrain from suggesting that physician communications with defense attorneys would be unlawful or improper.

## **CONCLUSION**

For the above reason, Defendants' Motion for An Order Concerning Contact With Physicians [510] is granted. Defendants may consult with and retain any of the six "design physicians" they have named who are willing to speak with them, subject to the safeguards set forth in the Proposed Order. Subject to those same safeguards, Defendants may further consult with and retain any

prospective expert witness who happens to be or was the treating physician for one or more Plaintiffs, provided that the total number of such witnesses contacted does not exceed twenty-five treating physicians, including the six physicians Defendants named in connection with their motion.

ENTER:

Dated: August 16, 2012

_____
REBECCA R. PALLMEYER
United States District Judge