# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: ZIMMER NEXGEN KNEE IMPLANT PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) MDL No. 2272<br>Master Docket No. 11 C 5468 |
| KATHY L. BATTY,<br>           Plaintiff,<br>      v.<br>ZIMMER, INC., ZIMMER HOLDINGS, INC., and ZIMMER ORTHOPAEDIC SURGICAL PRODUCTS, INC.,<br>           Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) No. 12 C 6279<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Kathy Batty is one of hundreds of Plaintiffs who have sued Defendants, Zimmer, Inc. and its affiliates (collectively, "Defendant" or "Zimmer"), manufacturers of the Zimmer NexGen Flex Knee system. Batty and others, who have had the NexGen Flex system implanted, allege that the femoral and tibial components of the system are prone to premature loosening, resulting in pain and loss of movement. Ms. Batty's case has been chosen for a "bellwether" trial. Both parties have identified several expert witnesses. In an earlier ruling [1536], the court considered challenges to two of Ms. Batty's proposed experts, Dr. Thomas Brown and Dr. Joseph Fetto. In this opinion, the court addresses Zimmer's objections to expert testimony from Ms. Batty's treating surgeon, Dr. Alan Klein [1297]. For the reasons set forth here, those objections are sustained in part and overruled in part.

## BACKGROUND

Dr. Alan Klein was Ms. Batty's treating surgeon from June 2, 2008 through December 6, 2010. (Dep. of Alan Klein, Ex. A to Zimmer Mem. in Supp. of Fifth Daubert Mot. [1299-1],

hereinafter "Klein Dep.," 34:18–23.) He diagnosed Ms. Batty as suffering from "bone-on-bone arthritis in both knees." (*Id.* at 40:4–6.) When conservative treatments failed to alleviate her pain, he recommended total knee replacements for both knees. (*Id.* at 40:7–23.) He performed knee replacement surgeries in April 2009, implanting the Zimmer NexGen LPS-Flex Gender Solutions Female knee implants in each knee. (*Id.* at 40:17–41:1, 47:11–13.)

Ms. Batty began complaining of pain in her knees in July 2010. X-rays taken in November 2010 showed "some radiolucencies around her right tibial tray that" may have been "a little bit enlarged from" the x-rays taken immediately after surgery. (Klein Dep. at 149:15–19.) The bone scan that Dr. Klein ordered in response to those November 2010 findings suggested that loosening and infection were likely, but blood tests he ordered to test for infection came back negative. (*Id.* at 148:18–19; 149:8–23.) Having determined that Ms. Batty's knees were loose but not infected, Dr. Klein referred her to Dr. Sewecke, another doctor in his practice, for a second opinion. (*Id.* at 149:8–16.) Dr. Sewecke's evaluation revealed "evidence of radiolucency at the bilateral tibial components," and he observed that the tibial components appeared to be in varus alignment—that is, the tibial component was not aligned parallel to the tibial bone, but was tilted outward. (*Id.* at 75:9–12, 75:20–76:1.) On March 1, 2011, Dr. Klein referred Ms. Batty to Dr. Lawrence Crossett, another orthopedic surgeon. Dr. Crossett also concluded that her x-rays showed tibial loosening in both knees, and that Ms. Batty required revision surgeries. (Dep. of Lawrence Crossett, Ex. C to Zimmer Reply Mem. in Supp. of Mot. for Summ. J. [1488-3], hereinafter "Crossett Dep.," 130:2–3.) Dr. Crossett performed the revision surgeries on April 18, 2011 (right knee) and May 11, 2011 (left knee), implanting the DePuy LCS revision system in each of Ms. Batty's knees. (Revision Reports, Ex. 25 to Decl. of Ronca in Supp. of Resp. to Zimmer Mot. for Partial Summ. J. [1462-25].)

Zimmer deposed Dr. Klein on January 14, 2014 as a fact witness only. During his deposition, however, both parties solicited testimony from Dr. Klein about a wide range of topics beyond his treatment of Ms. Batty. For example, Dr. Klein testified regarding the forces that

operate in the knee during flexion. He explained that if an implant cannot mimic the natural knee's axial rotation—that is, internal and external rotation—during flexion, the result is a "stress on the implant-bone interface," specifically a shearing, or pulling, stress. (Klein Dep. at 193:22–194:5.) He also commented on the strength of the cement bond, asserting that "if you flex your knee too far — see, normally a tibia is in compression, and the stresses, the cement are [sic] really good in compression. But if you load it abnormally, it would no longer be in compression, but in shear, and cement is not strong in shear." (*Id.* at 163:21–164:1.) Because the cement is not as strong in shear, repeated cycles of shearing stress could cause the implant to loosen. (*Id.* at 194:6–20.) When designing an implant, he continued, a manufacturer should attempt to avoid shearing forces at the bone-implant interface. (*Id.* at 164:2–8.)

After Dr. Klein's deposition, Zimmer retained Dr. Stuart Goodman, a board-certified orthopedic surgeon who earned the Ph.D. in Medical Science from Lund University in Sweden. As part of his expert report, Dr. Goodman criticized Dr. Klein's surgical technique, opining that he had implanted the tibial components at an improper angle and used too little cement to secure the components to the bone. (Stuart Goodman Exp. Rep., Ex. C to Pl.'s Resp. to Zimmer's Mot. to Exclude Dr. Klein [1456-3], hereinafter "Goodman Rep.," 2, 20.) Dr. Goodman contends that Dr. Klein's surgical technique, rather than the design of the components, was the cause of Ms. Batty's loosening. (*Id.* at 20.)

On September 19, 2014, in response to Dr. Goodman's report, Plaintiff disclosed a rebuttal report prepared by Dr. Klein. (*See* Sept. 9, 2014 Letter, Ex. B to Zimmer Mem. in Supp. of Fifth Mot. to Exclude [1299-2]; Klein Rebuttal Rep., Ex. C to Zimmer Mem. in Supp. of Fifth Mot. to Exclude [1299-3], hereinafter "Klein Rebuttal.") The rebuttal consists of a two-page letter in which Dr. Klein explains that while "it does appear that both knees look like they are in varus alignment in the immediate postoperative films and subsequently got worse," the x-ray prints were unreliable because the films did not show the whole leg (from hip to ankle). Moreover, he notes that it is difficult to measure the angles of the implants because most of the

3

x-rays "were rotated due to the fact that most of them were bilateral knees on the same film." (*Id.* at 1.) That is, Ms. Batty's legs were either internally or externally rotated, in relation to the x-ray beam, when the x-rays were taken. According to Dr. Klein, "one cannot accurately determine the true alignment of the tibial component without having a long leg film, which was never obtained." (*Id.*) In any event, even if the tibial components were in varus alignment, Dr. Klein observed that "in [his own practice] . . . many tibias are placed in a few degrees of varus and function quite well. In fact, the literature supports many tibias are placed in a few degrees of varus or valgus and do well." (*Id.* at 1–2.) As Zimmer notes, Dr. Klein does not specify what "literature" he is referencing in the rebuttal report, though he later clarified in a declaration[1] that "[t]he literature I referenced in my rebuttal report includes the literature reported by Dr. Goodman which says that overall anatomic valgus predicts longer survival for knee implants when the tibial alignment is less than or equal to 3 degrees of varus." (Decl. of Alan Klein, Ex. B. to Pl.'s Resp. to Zimmer's Fifth Mot. to Exclude [1456-2], hereinafter "Klein Decl." ¶ 7.) Finally, Dr. Klein asserts that he believes the tibial components were well-aligned because "on the weight bearing views [of the x-rays], the tibial components are parallel to the ground, which would mean the stress would be evenly distributed, and thus less likely to loosen." (Klein Rebuttal at 2.)

With respect to his cementing technique, Dr. Klein wrote in his rebuttal report that he has

> performed 100s of total knee replacements using 1 pack of cement. . . . I contend that the entire undersurface of the tibias had full cement and it is my practice to manually interdigitate[2] additional cement into the tibia prior to inserting the

---

[1] The declaration was attached to Plaintiff's response to Zimmer's motion to exclude Dr. Klein's testimony. The declaration elaborates on the topics covered in Dr. Klein's rebuttal report: alignment, cementing techniques, and his attempts to identify a cause of the loosening. (*See generally* Klein Decl.)

[2] Dr. Klein explained that interdigitation means that "the cement is sort of seeping into the pores of the bone." (Klein Dep. at 60:5–7.) Dr. Robert Booth, an orthopedic surgeon and Zimmer consultant, explained interdigitation as "a fancy word" for "mash[ing the cement] down with our thumb and push[ing] it into the pores of the bone." (Dep. of Robert E. Booth, Ex E. to Pl.'s Resp. to MSJ on Mult. Grounds [1466-5], 262:12–16.)

>prosthesis and then to remove any excess cement. . . . It is my practice to use as much cement as necessary on the tibial component and save additional cement for the femoral and the patella component.

(*Id.*) As further evidence that he used sufficient cement, he asserts that "[n]either of the femoral components in this patient loosened and [they] were noted to be well fixed on revision surgery. Clearly, there was enough cement left for the femur and the patella as well." (*Id.*) Had the cement been inadequate, he continues, the loosening would have manifested in the femoral component first, rather than the tibial component. He also acknowledged that Dr. Goodman might not see the cement interface on the x-ray, but explained that "[t]he amount of cement that is visible on a postoperative x-ray is dependent on the exact positioning of the x-ray beam versus the tibial component as well as the technique used during the x-ray as well as the degree of osteopenia[3] of the bone." (*Id.*)

Zimmer urges the court to limit Dr. Klein's testimony to his treatment of Ms. Batty. The opinions he offered regarding the forces operating on the implants, the possibility of edge loading and lift-off, and the adequacy of Zimmer's testing—all of those were formed outside the course of treatment and are not based on reliable methodologies, Zimmer contends. (Zimmer Mem. in Supp. of Fifth Mot. to Exclude [1299], hereinafter "Zimmer Mem.," 3.) Dr. Klein's rebuttal report should also be excluded, Zimmer continues, because it is unreliable and fails to comply with Federal Rule of Civil Procedure 26(a)(2)(B), which requires specially-retained experts to submit complete reports documenting their opinions. (Zimmer Mem. at 11–14.)

Plaintiff responds that Dr. Klein will not be called to testify regarding "forces or the specific testing Zimmer performed." (Pl.'s Resp. to Zimmer's Fifth Mem. [1455], hereinafter "Pl.'s Resp.," 2.) What Plaintiff does intend to offer are the opinions presented in Dr. Klein's rebuttal report. Those opinions, Plaintiff asserts, do not extend "outside his treatment of Mrs.

---

[3] "Osteopenia refers to bone density that is lower than normal peak density but not low enough to be classified as osteoporosis." *Opsteopenia – Overview*, WEBMD http://www.webmd.com/osteoporosis/tc/osteopenia-overview (last accessed May 27, 2015).

5

Batty, his surgical technique, his professional practice, and his experience as a trained and experienced joint replacement surgeon." (*Id.* at 1.) And because Dr. Klein has not been retained or specially employed to provide expert testimony, Plaintiff contends, his testimony is not subject to the requirements of Rule 26(a)(2)(B).

## **DISCUSSION**

As noted, Zimmer advances two arguments in support of its motion to exclude any testimony by Dr. Klein that covers topics other than his treatment of Ms. Batty. First, Zimmer notes the absence of the expert report called for by Rule 26(a)(2)(B) for any expert "retained or specially employed" by Plaintiff. Second, Zimmer urges that such testimony must be excluded under Federal Rule of Evidence 702 and *Daubert* because Dr. Klein is unqualified and has employed no reliable methodologies to reach his conclusions. Plaintiff responds that as her treating physician, Dr. Klein is not subject to the requirements of 26(a)(2)(B) and need only provide a summary disclosure under Rule 26(a)(2)(C). Moreover, Plaintiff contends that all of Dr. Klein's opinions are based on his "extensive training and practical experience as an orthopedic surgeon over the past 20 years along with his treatment of Mrs. Batty," and he is therefore well-qualified to provide opinions regarding alignment, cementing technique, and the causes of Ms. Batty's loosening. (Pl.'s Resp. at 1.)

The court agrees with Zimmer that, insofar as Dr. Klein's testimony exceeds the scope of his treatment of Ms. Batty, he must comply with the requirements of Rule 26(a)(2)(B). Any testimony regarding Zimmer's pre-market testing, the forces at work in the knee joint, or the likelihood of implant lift-off, therefore, will be excluded. The court disagrees, however, with Zimmer's assertion that the opinions contained in the rebuttal report require him to prepare an expert report. Dr. Klein's opinions regarding the alignment of the components, the adequacy of Dr. Klein's cementing technique, and causation are sufficiently related to his treatment of Ms. Batty and may be offered without compliance with Rule 26(a)(2)(B).

**I.      Requirements of Rule 26**

Rule 26 requires experts who are "retained or specially employed to provide expert testimony" to submit a detailed expert report containing a "complete statement" of their opinions, the "facts and data considered," the witness's qualifications, and a statement of compensation. FED. R. CIV. PRO. 26(a)(2)(B). If, however, "the witness is not required to provide a written report," under Rule 26(a)(2)(B), an expert need only provide a disclosure containing the "subject matter" of his or her testimony and a "summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. PRO. 26(a)(2)(C). Zimmer urges that several of Dr. Klein's opinions, elicited in his deposition and contained in his rebuttal report, constitute testimony of a "retained" expert under 26(a)(2)(B) requiring a complete expert report.

Plaintiff acknowledges that Dr. Klein has not submitted an expert report that complies with the requirements of Rule 26(a)(2)(B), but rather urges that "[b]etween Dr. Klein's deposition testimony and his rebuttal report Zimmer cannot claim that they were not properly put on notice of his testimony." He has, thus, complied with the summary disclosure requirements of 26(a)(2)(C), the only requirements applicable to him as a treating physician, Plaintiff contends. (Pl.'s Resp. at 3.) Plaintiff notes that when Rule 26(a)(2)(C) was added in 2010, the Committee Notes explained that frequent examples of experts who are required to submit summary disclosures in place of expert reports "include physicians and other health care professionals." FED. R. CIV. PRO. 26 (Committee Notes, 2010 Amendments).

Significantly, however, in *Meyers v. National Railroad Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010), the Seventh Circuit held that "a treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report," pursuant to Rule 26(a)(2)(B). *Id.* at 734–35. The purpose of this requirement is "to provide adequate notice of the substance of the expert's forthcoming testimony and to give the

opposing party time to prepare for a response." (*Id.* at 734.) *Meyers* dictates that any of Dr. Klein's opinions not formed in the course of his treatment of Ms. Batty are inadmissible if not disclosed in a complete expert report pursuant to Rule 26(a)(2)(B).

Plaintiff notes that *Meyers* was decided prior to the 2010 amendments adding Rule 26(a)(2)(C)'s summary disclosure procedure and argues that the amendments "clarified that treating physicians are not required to submit a complete expert report." (Pl.'s Resp. at 3.) The court does not read the 2010 amendments this way. The Committee Notes accompanying those amendments suggest that the first question courts must address is whether an expert is required to issue a report under 26(a)(2)(B) or not: the summary disclosure process was added for "expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) . . . [a]n (a)(2)(B) report is required only from an expert described in (a)(2)(B)." The 2010 amendments did not alter the scope of 26(a)(2)(B), which governs experts who are "retained or specially employed." Though decided prior to the 2010 amendments, *Meyers* established a test for determining when a treating physician is "retained or specially employed" within the meaning of 26(a)(2)(B). The 2010 amendments, thus, did not alter how courts should address the threshold question of which experts are covered by 26(a)(2)(B), but rather, added a summary disclosure requirement for experts not retained or specially employed.

Consistent with this analysis, the Seventh Circuit itself has continued to apply the *Meyers* test after the 2010 amendments. *See E.E.O.C. v. AutoZone, Inc.,* 707 F.3d 824, 833 (7th Cir. 2013) ("[A] treating physician can provide an expert opinion without submitting a written report if the physician's opinion was formed during the course of the physician's treatment, and not in preparation for litigation.") (quoting *Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734–35 (7th Cir. 2010)). *See also Piskorowski v. Target Corp.,* No. 12-cv-8865, 2014 WL 321436, at *2 (N.D. Ill. Jan. 29, 2014) ("the amendments did not alter who was required to file an expert disclosure" but rather altered the type of disclosures required for experts not retained or specifically employed.)

8

Plaintiff argues that Dr. Klein has not been retained or specially employed to provide expert opinions in this case and that "[a]ll of Dr. Klein's expert opinions were formed either during or after his treatment of Mrs. Batty." (Pl.'s Resp. at 1.) True enough, but the question the court must answer is which of his opinions were formed during his treatment, and which after. The court turns to that question now.

## II. Scope of testimony

Zimmer urges that Dr. Klein's opinions regarding the forces in the knee, edge loading, implant lift-off, and the adequacy of Zimmer's testing are untethered to his treatment of Ms. Batty and must be excluded for failure to comply with Rule 26. Effectively conceding the point, Plaintiff has represented that she does not intend to call Dr. Klein to offer opinions on these topics. In any event, those opinions would be excluded because they exceed the scope of Dr. Klein's treatment and have not been presented in an expert report identifying the facts and data supporting his conclusions. *See* FED. R. CIV. PRO. 37(c)(1) ("A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.")[4]

Zimmer maintains that the rebuttal report also failed to comply with the requirements of Rule 26(a)(2)(B) and should likewise be excluded. (Zimmer Mem. at 13; Zimmer Reply Mem. in Supp. of Fifth Daubert Mot. [1493], hereinafter "Zimmer Reply," 1–2.) Dr. Klein's rebuttal report covers three categories: (1) the alignment of the implants, (2) his cementing technique, and (3) the cause of Ms. Batty's loosening. The court concludes that those opinions relate to Dr. Klein's

---

[4] Without any description of the basis of his opinions, the court is also required to conclude that they are inadmissible under Federal Rule of Evidence 702 and *Daubert.* An expert's "failure to explain his methodology," permits the court to "conclude that the report offer[s] 'nothing of value to the judicial process.'" *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) (quoting *Wendler*, 521 F.3d at 791). *See also Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

9

treatment choices. Moreover, those opinions were presented in his deposition upon questioning about his treatment of Ms. Batty, and Zimmer is therefore not prejudiced by their admission in this context.

### A. Alignment of implants

Dr. Klein opines in his rebuttal report that Ms. Batty's tibial components are well-aligned. Zimmer urges he did not form this opinion during the course of treatment, but rather, reached this conclusion only for this litigation. (Zimmer Reply at 3.) The court disagrees. Dr. Klein explained that it is normal practice to take an x-ray in the recovery room immediately after surgery, and while those x-rays are not as accurate as those taken in the x-ray room with the patient standing, "[it] gives us an idea about alignment." (Klein Dep. at 65:1–7.) Moreover, at Ms. Batty's first follow-up visit after both knees had been replaced, Dr. Klein again took x-rays, which, according to his notes, showed "well fixed total knees." (*Id.* at 121:23–122:14.) Dr. Klein explained that when he wrote "well fixed total knees" he meant that the knees "were aligned well, there was cement appropriate around the prosthesis, no gaps, no fractures, good alignment." (*Id.* at 122:13–18.) His rebuttal report confirms that his assessment of Ms. Batty's alignment is based on his experience as a surgeon and thus is intertwined with opinions he formed during the course of her treatment. Specifically, he states that "in my own practice . . . many tibias are placed in a few degrees of varus and function quite well," to explain why he believed her alignment was good. (Klein Rebuttal at 1–2.)

Zimmer urges that, even if Dr. Klein evaluated Ms. Batty's alignment during the course of treatment, he went further at his deposition and in his rebuttal report. During the deposition, Dr. Klein was asked to review the same x-rays he had reviewed at his follow-up visits with Ms. Batty. He observed from those x-rays that

> [t]he femoral component appears to be aligned quite well. The tibial component looks to me maybe one or two degrees in varus, if you want to be critical. But you can't say for certain because there could be some rotational deformity of the X-ray. But it looks like a reasonably well aligned knee replacement.

10

(Klein Dep. at 110:11–17.) Moreover, he explained that "looking at it today on this X-ray it looks like that it is still probably two degrees away from perfect. But still in very acceptable alignment." (*Id.* at 112:16–19.) In the rebuttal report, he asserts that "[i]t does appear that both knees look like they are in varus alignment in the immediate postoperative films and subsequently got worse." (Klein Rebuttal at 1.)

Zimmer argues that these opinions were formed solely for litigation in an effort to counter the opinions of Dr. Goodman. (Zimmer Reply at 3–4.) The court disagrees. Dr. Klein's deposition occurred before Dr. Goodman completed his report; his opinions could not have been formed to rebut Dr. Goodman's specific criticisms. Moreover, though apparently based on his review of the x-rays during the deposition, Dr. Klein's testimony, and his opinion in the rebuttal report, help explain and elaborate on his observations and opinions originally formed during the course of Ms. Batty's treatment. That is, the court finds the relationship between Dr. Klein's rebuttal reports and his treatment observations to be close enough that a separate expert report is not necessary to put Zimmer on notice of these opinions.

Moreover, insofar as these opinions do extend beyond Dr. Klein's treatment of Ms. Batty, and are governed by the requirements of Rule 26(a)(2)(B), the court is satisfied that the opinions are reliable and that exclusion is not an appropriate remedy. First, Dr. Klein's opinions on alignment and cementing are based on the same methodology he uses in his practice. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting *Kumho Tire* 526 U.S.at 152). Evaluating the alignment and fixation of components based on visual observations of x-rays is a critical part of Dr. Klein's practice as an orthopedic surgeon. (*See* Klein Decl. ¶ 3) ("It is an important part of my follow up that at each postoperative visit I take x-rays and check the alignment of the implants. I did that in Mrs. Batty's case.") Zimmer asserts that because Dr. Klein acknowledged that long-leg x-rays are more reliable, his analysis

11

based on short-leg x-rays is necessarily unsound (*see* Zimmer Reply at 7), but measuring alignment based on short-leg x-rays is a commonly used method in Dr. Klein's and other orthopedic surgeons' practice. (*See* Klein Dep. at 65:1–20.) Zimmer is free to critique Dr. Klein's assessment during cross-examination, but that criticism does not require exclusion.

Nor should these opinions be excluded for failure to provide an expert report. "The consequence of non-compliance with Rule 26(a)(2)(B) is 'exclusion of an expert's testimony . . . unless the failure was substantially justified or is harmless.'" *Meyers*, 619 F.3d at 734 (quoting *Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009) and FED. R. CIV. PRO. 37(c)(1)). Admitting these opinions is harmless to Zimmer: During his deposition, Dr. Klein clearly articulated his opinions about alignment; nothing in his rebuttal report could be construed as a surprise. In the deposition excerpts quoted above, Dr. Klein evaluated the alignment of the components and noted the possibility that if Ms. Batty rotated her leg while the x-ray was taken, that rotation could undermine the accuracy of the x-rays. (*See also* Klein Dep. at 126:17–24) (reviewing an x-ray and suggesting that "it just shows [how] I think rotation of the leg can affect the alignment of the x-ray, how it appears.") He also testified that the weight-bearing x-rays showed good alignment of the tibial component: He pointed out that the "tibial component is completely parallel with the ground, which is shown to be very helpful to minimize excessive stress on one side of the other. So I think I really did a very good job." (Klein Dep. at 113:1–11.) After the deposition, Zimmer's expert, Dr. Goodman, had an opportunity to review Dr. Klein's testimony and opinions and in fact prepared a report criticizing Dr. Klein's techniques and opinions. (Goodman Rep. at 31) (citing "Deposition of Alan H. Klein" as one of the materials reviewed in preparation of Dr. Goodman's report.) Zimmer is well-equipped to challenge Dr. Klein's opinions on cross-examination and will suffer no unfair prejudice from admitting this testimony without a complete expert report.

### B. Cementing technique

Dr. Klein's opinions about his cementing technique are likewise tethered to his treatment of Ms. Batty. The discussion of cementing technique in the rebuttal report centers on a description of Dr. Klein's usual practice: Dr. Klein notes that he cements the tibial component first, using as much cement as he believes is necessary, and manually interdigitates additional cement into the tibia, before inserting the prosthesis. (Klein Rebuttal at 2.) Then he uses the remaining cement for the femoral and patellar component, and will use a second pack at that stage of the surgery, if he finds it necessary. (*Id.*) Dr. Klein's comments on his cementing practice were an obvious and direct response to Dr. Goodman's speculation that poor cementing practice was the cause of the loosening Ms. Batty experienced, but this does not mean that Dr. Klein formed those opinions solely for litigation.

Zimmer argues that the court should exclude this testimony because Dr. Klein offered no "scientific support for the required fixation strength and appropriate amount of cement required to obtain good fixation under Ms. Batty's flexion, loads, and cycles of use." (Zimmer Mem. at 13; *see also* Zimmer Reply at 6 ("Even in his Declaration, Dr. Klein remains vague about the scientific bases for his opinions about his own cementing technique, making these statements inadmissible.").) This argument presupposes that Dr. Klein's opinions are subject to the disclosure requirements of expert reports. Before the court evaluates whether Dr. Klein has sufficiently disclosed the bases for his opinions, Zimmer must first explain why Dr. Klein's description of his surgical technique constitutes an opinion formed outside "the course of providing treatment." *Meyers*, 619 F.3d at 735. The closest Zimmer comes to addressing this question is its claim that Dr. Klein is "opining that nothing about his technique contributed to her failure, but without explaining why." (Zimmer Reply at 9.) The fact that a jury could infer from his testimony that Dr. Klein's cementing technique was not the cause of Ms. Batty's injury, again does not necessarily mean that Dr. Klein's opinion was formed solely for litigation. The central

question remains whether Dr. Klein formed his opinion about the amount of cement during the course of treatment or after.

The court concludes that Dr. Klein made a determination about the adequacy of his cementing technique during treatment. First, when cementing the components during surgery, Dr. Klein relied on his experience implanting knees to form an opinion that the amount of cement he used was adequate and would provide good fixation for Ms. Batty's implants. That opinion was the basis for his decision to use one, rather than two, packs of cement. Moreover, as articulated above, as part of his post-operative review of Ms. Batty's X-rays and at her initial follow-up visits he concluded, and documented in Ms. Batty's medical records, that the components were "well-fixed." This sharply distinguishes Dr. Klein's testimony from that considered in *Meyers* where the court found "no evidence . . . that either doctor previously considered or determined the cause" of the injuries. *Meyers*, 619 F.3d at 735. Dr. Klein may therefore testify regarding his opinion, formed during surgery, that "[c]learly, there was enough cement left for the femur and the patella as well. I do use 2 packs of cement, in larger patients with larger prostheses, but I assure you 1 pack of cement is adequate for this size component." (Klein Rebuttal at 2.) Zimmer may, of course, challenge the basis for Dr. Klein's opinion on cross-examination, and present evidence that one pack of cement is insufficient, but Zimmer's criticisms do not convert Dr. Klein's opinion formed during the course of treatment into one requiring disclosure in a Rule 26(a)(2)(B) report.[5]

---

[5] As with his testimony regarding the alignment of the components, the court concludes that, even if Dr. Klein were required to submit an expert report, his failure to do so was harmless. Dr. Klein expressed his view that his cementing technique was adequate, based on his own personal experience, and Zimmer's expert Dr. Goodman was able to review and criticize that opinion in his expert report. Zimmer is therefore, well-equipped to cross-examine Dr. Klein regarding his cementing technique.

### C. Causes of Ms. Batty's Loosening

The most difficult question is whether Dr. Klein can testify about the cause of Ms. Batty's loosening. The Seventh Circuit has cautioned that when physicians discuss causation, often that testimony will be too far afield from treatment choices, and will necessitate a complete expert report. *See Meyers,* 619 F.3d at 734–35; *see also Coleman v. Am. Fam. Mut. Ins. Co.*, 274 F.R.D. 641 (N.D. Ind. 2011) ("Physicians who intend to offer testimony regarding causation of the plaintiff's injuries often go beyond the scope of treatment, requiring the physician to submit a complete expert report.") At bottom, however, the question remains the same: which opinions did Dr. Klein form during his treatment of Ms. Batty and which were formed solely for litigation?

Zimmer highlights portions of Dr. Klein's testimony in which Dr. Klein confirms that he has "no opinion about the cause of the loosening of [Ms. Batty's] tibial components." (Klein Dep. at 82:7–9.) Plaintiff responds that Dr. Klein will "not be offered to provide expert testimony that the high flex design of Mrs. Batty's implants is what caused her implants to fail prematurely." (Pl.'s Resp. at 13.) Rather, Plaintiff intends to call Dr. Klein to testify regarding the "other potential causes that he ruled out and how he ruled them out." (*Id.*)

The court agrees with Zimmer that Dr. Klein did not determine, as part of his treatment, that the design of Flex knee implant caused Ms. Batty's loosening, and he may not testify that the product or its design caused the implant to loosen. But the court agrees with Plaintiff that Dr. Klein, as part of his treatment, did rule out certain causes and may testify regarding how he arrived at those conclusions. Dr. Klein testified that there were no complications during Ms. Batty's surgeries (Klein Dep. at 114:25–115:6, 116:10–12), and, as explained above, his review of her post-operative x-rays showed good alignment, good cement fixation, and proper spacing. He also described that, during the surgery, he did not observe any abnormal anatomical findings, such as weak bone structure or bone stock, that would cause him to anticipate problems with Ms. Batty's knee replacements. (*Id.* at 115:7–15.) Dr. Klein testified that Ms.

Batty's surgery was consistent with the many other knee replacement surgeries he had conducted and which had been successful. (*Id.* at 117:18–22.) Dr. Klein was, therefore, surprised when the component started to loosen. (*Id.* at 118:4–23; 148:2.) In his effort to determine why this had happened, he first thought was that Ms. Batty had an infection; he ordered a bone scan and bloodwork, which ruled out that cause. (Klein Dep. at 149:15–150:16.) Dr. Klein also noted that nothing about Ms. Batty's activity levels could explain the loosening, and "if it wasn't infection, I couldn't think of anything else." (*Id.* at 202:6–22.) Dr. Klein does not opine in the rebuttal report that the devices caused the injury, and insofar as he does, that testimony will be excluded for failure to comply with Rule 26(a)(2)(B). As part of his treatment, however, Dr. Klein did rule out Ms. Batty's bone structure, the alignment of the joint, her activity, infection, trauma to the knee, or complications from surgery as causes of the loosening. (*Id.* at 202:6–22; Klein Decl. at 6.) Because those opinions were formed in the course of treatment, Dr. Klein is not required to present a complete expert report under Rule 26(a)(2)(B).

### III. Testimony about warnings

In its *Daubert* motion, Zimmer also argues that Dr. Klein's testimony about warnings is inadequate to show causation for Plaintiff's failure to warn claim. This argument does not pertain to the reliability or relevance of Dr. Klein's testimony under Rule 702 or *Daubert.* The court therefore declines to address the argument at this time, but will instead take it up in the context of Zimmer's motion for summary judgment on Ms. Batty's failure-to-warn theory.

## **CONCLUSION**

In sum, Zimmer's motion [1297] to exclude the testimony of Dr. Klein is granted in part and denied in part. Dr. Klein's testimony will be limited to his observations and opinions formed during his course of treating Ms. Batty. He is precluded from opining regarding the particular forces and stresses at work on the knee, the adequacy of Zimmer's testing, or whether the design of the knee caused Ms. Batty's loosening. His testimony regarding the alignment and

cementing of Ms. Batty's components, as well as how he eliminated certain causes when trying to find the source of the loosening will be admitted.

ENTER:

Dated:  June 17, 2015

*[signature: Rebecca R. Pallmeyer]*
_____
REBECCA R. PALLMEYER
United States District Judge